IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JANE DOE 2, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 2023-cv-00582 |
| | ) | |
| v. | ) | |
| | ) | |
| JIMMIE ALLEN, AADYN'S DAD TOURING, INC., CHARLES HURD, and JOHN DOES 1-100, | ) | JUDGE ALETA A. TRAUGER |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR DAMAGES RESULTING FROM DEFAULT JUDGMENT**

## I. INTRODUCTION

This action arises from the predatory acts of Defendant Jimmie Allen ("Allen") towards Plaintiff Jane Doe 2 ("Plaintiff")—facilitated by Allen's bodyguard Charles Hurd ("Hurd"), who was employed by Defendant Aadyn's Dad Touring, Inc. ("ADT")—in a Las Vegas hotel room, including the filming of their sexual encounter without her consent. (*See* ECF 41). Plaintiff brings claims for battery, assault, invasion of privacy, intentional infliction of emotional distress, negligent failure to warn, and negligent hiring, retention, or supervision against Defendants Allen, Hurd, and ADT. (*Id.*).

Due to Defendants' persistent failure to comply with case management discovery deadlines and Court Orders, Plaintiff filed a Motion for Sanctions and Judgment Against Allen and ADT. (ECF 81). After Defendants deliberately failed to respond, the Court granted Plaintiff's motion, entering sanctions in the form of a default judgment against Allen and ADT. (ECF 86). Pursuant to the Court's order, Plaintiff now moves solely for damages. (*Id.*).

## II. FACTUAL BACKGROUND

### A. Defendant Allen Actively Pursued Plaintiff and Indicated Long-Term Relationship Intentions.

Plaintiff first met Allen over Memorial Day weekend in 2022 on a flight to Nashville, Tennessee. Ex.[1] A, Welsh Dep. 7:24-8:22. Plaintiff and her three friends were celebrating one friend's recent engagement. Ex. B, Hemington Dep. 10:1-2. Plaintiff was the only single woman of the group—described by her friends as "fun," "outgoing," "funny," "confident," "silly," "a lot of fun," and "very herself all the time." *Id.* at 9:24-25; Ex. A at 7:13-19.

On the flight to Nashville, Plaintiff made small talk with Allen. Ex. B at 10:15-11:7. After landing, Allen's bodyguard, Hurd, approached the group of women and told them that Allen wanted to invite them for a drink later. *See* Ex. A at 9:14-10:8. Plaintiff provided her Instagram profile to Hurd, *id.*, and, shortly thereafter, Allen contacted Plaintiff via Instagram, telling her that it was great to meet her and asking how long she and her friends would be in Nashville. Ex. C. Later that evening, Plaintiff and her friends met Allen at Legends Corner, a bar in Nashville, where Allen purchased a round of drinks for the group. Ex. A at 10:15-11:9. When asked about his marital status, Allen assured Plaintiff and her friends that he was separated from his wife. *Id.* at 11:10-14.

Following the trip, Allen began to communicate frequently with Plaintiff—"texting, Facetiming, sending pictures at least every day" like they were "dating each other." *Id.* at 13:4-9. At work, Plaintiff would also frequently FaceTime Allen throughout the day. Ex. D, Seegmiller Dep. at 10:6-18. Although Plaintiff was not initially romantically interested in Allen, the courtship phase led Plaintiff to believe that Allen could be trusted and cared deeply about her. Ex. B at 15:10-25. For example, Allen would regularly flirt with Plaintiff and talk about seeing her in person, Ex.

---

[1] All Exhibits referenced herein are Exhibits to the concurrently filed Declaration of Elizabeth A. Fegan.

D at 10:21-23, telling Plaintiff "… **you're my dream girl. You're everything I've ever wanted**." Ex. B at 17:16-19 (bold added). Such comments led Plaintiff to believe that Allen was serious about a future with her: "I think he really likes me … he's being so respectful. **He's telling me he wants a family with me**." *Id.* at 15:10-16 (bold added). Allen's focus on building a family with Plaintiff continued, with Allen texting Plaintiff a photo of her sitting next to a young boy and asking Plaintiff if she was "[g]ettin ready for ours?" Ex. E. Despite Allen having told Plaintiff that he was separated from his wife, Plaintiff noticed in one of their text exchanges that Allen was wearing his wedding ring: "I love your wedding ring. I think you forgot to wear it when you saw me. Lol." Ex. F. Allen continuously assured Plaintiff that he and his wife were merely maintaining appearances for their children, convincing her that "it wasn't what it was." Ex. B at 16:19-17:5.

### B. Allen's Predatory Acts Towards Plaintiff in Las Vegas.

As the two continued to communicate regularly and discuss building a life together, Allen invited Plaintiff to Las Vegas, where he was attending several work events, to spend the Fourth of July weekend together and possibly continue their trip to Portland, Oregon. Ex. A at 13:12-25. Plaintiff was adamant that, during this trip, the two have separate rooms given that this was their first in-person date—she wanted her own room "for comfort… so nothing was to happen" and because "she didn't want to move that quickly" with Allen. *Id.* at 14:3-8; Ex. B at 18:17-20; Ex. D at 11:23-25.

When Plaintiff arrived in Las Vegas, she notified Allen, who then instructed her to take a taxi to South Point Hotel Casino where he was attending his work event. Exs. G-H. While at the work events in Las Vegas, Allen held Plaintiff's hand and introduced her to people in public, referring to her as his girlfriend. Ex. A at 14:9-19; Ex. B at 19:10-18. The two also FaceTimed Plaintiff's friends. Ex. A at 14:17-19. Plaintiff understood that these public displays meant that Allen was not lying about his separation from his wife, Ex. B at 19:10-15, and Plaintiff updated

her friends throughout the day about the trip and Allen's public affection towards her. *See id.* at 19:8-20:3.

The next time that Plaintiff spoke to her friends was a series of panicked phone calls in the middle of the night, *id.* at 20:4-12; Ex. A at 17:15-17, where Plaintiff shared—frantic, crying, and shaky, Ex. B at 21:15-25; Ex. A at 16:13-21—what had happened with Allen. Allen and Hurd asked Plaintiff to wait in Allen's room while Hurd supposedly secured a separate room for her. ECF 41 at ¶ 4. There, Allen and Plaintiff stood on the balcony looking at the Las Vegas skyline and kissed. Ex. A at 18:9-12. While on the balcony, Plaintiff was instructed to "[s]tay right here. Don't turn around. I have a surprise for you." *Id.* at 18:12-14. When Allen returned, he guided Plaintiff to the bedroom and the two engaged in various sexual acts and intercourse. *Id.* at 18:15-19. Immediately afterwards, Allen fell asleep, and Plaintiff tried to wake him because she wanted to return to the room that he had promised her, but he was fast asleep. *Id.* at 18:19-25. Plaintiff got up to get dressed and then sat back down on the bed. As she sat there, she noticed Allen's phone propped on the ironing board in the closet facing the bed and recording. *Id.* at 19:3-6. After discovering that Allen had been recording their sexual encounter, without her consent, she immediately grabbed the phone, stopped the recording, and left the room extremely distressed. *Id.* Plaintiff took Allen's phone with her to ensure that she could delete the video recording. *Id.* at 19:15-17.

Plaintiff was left alone and scared: "I don't know what to do. I don't know what to do … He was recording me … I'm shaking and I don't know what to do. I'm panicking." Ex. B at 21:1-17. Plaintiff was also desperate to leave Las Vegas as soon as possible: "I need to find a flight to go home tomorrow." Ex. A at 19:20-25. Not only did Plaintiff feel unsafe, in a city knowing no one other than Allen and Hurd, but she did not have a separate room and her phone was dying.

Huddled in a corner of the hotel lobby, Plaintiff tried to charge her phone and was unable to stop crying. Ex. B at 22:8-11. She felt violated, taken advantage of, and dirty as a result of the encounter with Allen, obsessive about needing a bath and Plan B, particularly because Allen had not used protection. *Id.* at 21:18-25; 22:22-25; 24:18-25:4. She felt guilty and shameful for trusting Allen and was particularly concerned about having the video on Allen's phone deleted: "I just want him to give me the passcode so I can delete the video and know it's gone." *Id.* at 24:18-25; 25:10-25.

Walking alone in the streets of Las Vegas, Plaintiff called a friend, who helped Plaintiff find a hotel room away from Allen and locate Plan B, Ex. B at 21:14-22:25, and who instructed her to go to the police and turn off the phone so that Defendants couldn't track her location. *Id.* Plaintiff felt betrayed, "I just really did like him it sucks I feel sad and dumb," Ex. I, and she expressed intense feelings of shame and violation, having been taken advantage of by Allen. Ex. B at 24:18-25. The following day, Plaintiff was still in shock, Ex. A at 20:10-12, and Plaintiff's friends became concerned about her wellbeing: "I've known [Plaintiff] my whole life, and I've never heard her so shaky and scared," "she felt so violated and she felt taken advantage of." Ex. B at 23:23-24; 24:22-23.

Allen used another phone to contact Plaintiff after the incident, attempting to get her to meet up with him. Exs. J-K. Plaintiff made clear that she had moved her flight up, that she did not consent to being recorded, and expressed her feelings regarding Allen's predatory acts and the betrayal she felt: "I liked you Jimmie and I would have been really good to you…You disrespected me, lied to me…I loved talking to you and enjoyed getting to know you but if you can't be real or transparent with people you will keep chasing women and looking for your next ego boost…." *Id*.

## C. The Emotional Impact of Allen's Predatory Acts on Plaintiff.

Following the traumatic incident in Las Vegas, changes to Plaintiff's mental health were quickly observed, including reverting to an eating disorder and turning to alcohol abuse. Ex. B at

5

35:19-36:4; 36:12-15. Plaintiff's friends observed that Plaintiff was "traumatized" and "violated" by the incident. Ex. D at 15:2-9, which led to insecurities and concerns about the video that Allen recorded going public. Ex. B at 35:14-18. This trauma bled into Plaintiff's work life with co-workers noticing a change: "after the incident, [Plaintiff] could barely speak to her clients. She was crying at work. She was acting unprofessionally and could barely get through the day without crying and being emotionally distraught after the incident." Ex. D at 17:1-7. Plaintiff "never emotionally dealt with it [the trauma of Las Vegas] … **she has never been well since that weekend she came home.**" Ex. B at 37:1-9 (bold added). Indeed, Plaintiff has since been diagnosed with Post Traumatic Stress Disorder. *See* Declaration of Stephanie J. Christl ("Christl Decl.") ¶ 5. Plaintiff continues to navigate numerous PTSD symptoms, including unwanted and emotionally disruptive memories; avoidance of memories, thoughts, or feelings related to the trauma; negative alterations to mood and concepts of the self and others, including persistent feelings of guilt, self-blame, and disgust; and symptoms of increased hyper-vigilance. *Id.*

### III. ARGUMENT

**A. Plaintiff's Damages Are Calculable Based on the Undisputed Evidence.**

Once a default has been entered, all the plaintiff's well-pleaded allegations are deemed admitted, including jurisdictional allegations. *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 846 (E.D. Mich. 2006) (citing *Visioneering Constr. v. U.S. Fidelity and Guar.*, 661 F.2d 119, 124 (6th Cir. 1981)); *see also* Fed. R. Civ. P. 8(b)(6) (providing that "[a]n allegation—other than one relating to the amount of damages—is admitted."). Notwithstanding a Court order granting default judgment, Plaintiff "must still establish the extent of damages." *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995) (internal citations omitted). While Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that a district court may hold an evidentiary hearing to determine damages, it does not require one. *Vesligaj v. Peterson*, 331 F. App'x 351, 354 (6th Cir. 2009)

(citing *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989)); *see also Renfro v. Willow Tree Health Care*, No. 3:22-cv-00857, 2024 U.S. Dist. LEXIS 114692, at *6-7 (M.D. Tenn. June 28, 2024) (granting motion without evidentiary hearing as Complaint and Declaration adequately specified damages Plaintiff sought and Court had no reason to believe Defendants would appear at evidentiary hearing).

To be eligible for compensatory damages, Plaintiff must prove that the Defendants' unlawful actions caused emotional distress. *Carey v. Piphus*, 435 U.S. 247, 263-64 (1978). "Any award for emotional injury greater than nominal damages must be supported by evidence of the character and severity of the injury to the Plaintiff's emotional well-being." *Rice v. Mark IV Auto.*, No. 01-1255, 2002 U.S. Dist. LEXIS 13329, at *6 (W.D. Tenn. June 11, 2002) (internal citations omitted). Plaintiff's testimony, along with the circumstances of the case, can suffice. *Id.*; *see also Holmes v. TeleCheck Int'l, Inc.*, 556 F. Supp. 2d 819, 844 (M.D. Tenn. 2008); *Dancy v. Lanxess Corp.*, No. 19-cv-02690-SHL-tmp, 2020 U.S. Dist. LEXIS 161433, at *7 (W.D. Tenn. Sep. 3, 2020) (a plaintiff must introduce adequate proof in support of any emotional distress damages, which can be backed by testimony). A plaintiff also must provide evidence in support of the reasonableness and necessity of any medical expenses that she seeks to recover. *See Pacheco v. Johnson*, No. 3:11-cv-00221, 2017 U.S. Dist. LEXIS 116960, at *4-5 (M.D. Tenn. July 26, 2017).

Here, and as outlined in the supporting declarations and exhibits, Plaintiff's damages are calculable—she is seeking $253,142.00 in emotional distress damages, $3,505.00 in past treatment expenses, $340,200.00 in future treatment expenses, and $1,193,694.00 in punitive damages, plus post-judgment interest at the rate mandated by 28 U.S.C. § 1961.

**B. This Court Should Award Plaintiff at Least $253,142.00 for Pain and Suffering.**

As a result of Defendants' actions, Plaintiff's mental health has significantly deteriorated, and she has been diagnosed with PTSD. *See generally* Christl Decl. After the incident, Plaintiff

became emotionally distraught, anxious, unfocused at work, and disconnected from friends and family. *See generally* Christl Decl.; Ex. B; Ex. D. Plaintiff also began abusing alcohol, reverted to an eating disorder that she had recovered from in high school, *see* Ex. B at 35:23-36:15, and was diagnosed with PTSD. *See* Christl Decl. ¶ 5. While Plaintiff has sought psychological and psychiatric help and takes prescribed medication to address her mental health struggles, she continues to navigate the trauma caused by Defendants and has not had the money to receive full treatment.

Before the trauma caused by Defendants, those closest to Plaintiff described her as happy, "fun, outgoing … very kind," "really friendly," "sweet and bubbly," and "one of the hardest worker[s] I know." Ex. B at 9:21-10:14; Ex. D at 8:14-15; 17:1-7. However, Plaintiff's friends immediately became concerned about Plaintiff's wellbeing after the incident in Las Vegas: "I've known [Plaintiff] my whole life, and I've never heard her so shaky and scared," "she felt so violated and she felt taken advantage of." Ex. B at 23:23-24; 24:22-23. Changes to Plaintiff's mental health were quickly observed, including reverting to an eating disorder and turning to alcohol abuse. *Id.* at 35:19-36:4; 36:12-15. Indeed, Plaintiff "has never been well since that weekend [after Las Vegas] she came home." *Id.* at 37:1-9. Likewise, Plaintiff's co-workers noticed a change—Plaintiff was emotionally distraught and unable to get through the day in a professional manner due to her emotional distress. *See* Ex. D at 17:1-7.

When Plaintiff ultimately sought professional help in September 2022, Stephanie J. Christl (hereinafter "Christl")—a certified health and wellness coach at Christl Coaching and Trauma, Inc.—recognized that the Las Vegas incident with Allen "was still having an effect on her emotional state … she's very blocked, very disconnected, disassociated." Ex. L, Christl. Dep. 28:8-29:5; *see also* Christl. Decl. ¶ 4. Christl also identified that the trauma associated with the

encounter with Allen in Las Vegas continued to affect Plaintiff's personal relationships, including causing an inability to connect with her boyfriend and infant child, mood and anxiety swings, and increased alcohol consumption. Ex. L, at 34:11-24; Christl. Decl. ¶ 4.

After assessing Plaintiff's symptoms,[2] and treating Plaintiff over the course of 14 sessions, Ex. M, Christl Hourly Statement, Christl provided a summary report of Plaintiff's condition.[3] *See* Ex. N, Christl Summary. Christl assessed that Plaintiff was "suffering from signs and symptoms of Post-traumatic Stress Disorder (PTSD)" as a result of the Las Vegas incident with Allen, which had threatened Plaintiff's "moral integrity and dignity." *Id.* Christl also outlined Plaintiff's 12 different presentations, consistent with the criteria for PTSD, including "intrusive, distressing thoughts or images that recall the traumatic event," "intense distrust in interpersonal relationships," and "intense distress when hearing the perpetrators [Allen] voice," *Id.*; *see also* Christl. Decl. ¶ 5. Thus, it is clear that Plaintiff has suffered, and continues to suffer, severe emotional distress as a result of the incident in Las Vegas with Allen. *See generally* Christl. Decl.

In similar cases involving invasion of privacy and video voyeurism, plaintiffs have routinely been awarded significant compensatory damages. Ex. O, *Jane Doe and John Doe v. Kevin Moncla*, 2006 Jury Verdicts LEXIS 44059 2004-CA-000374 (awarding the two plaintiffs $500,000 in past pain and suffering, $750,000 in future pain and suffering, and $2,000,000 in punitive damages for the capturing of intimate and private moments, without consent, with a camera in a bathroom vent);[4] Ex. P, *JoAn Couche v. John Coons*, 2002 Jury Verdicts LEXIS 55522

---

[2] Christl relied on various assessment tools, including the PTSD Interpersonal Relationships Manual, the Amen Clinic Questionnaire, the Adverse Childhood Experience Questionnaire. Christl. Decl. ¶ 4.

[3] This report was prepared, per standard practice, based on Christl's notes of, and observations during, her sessions with Plaintiff. All opinions expressed in the report are consistent with Christl's professional expertise and training in trauma. Christl. Decl. ¶¶ 5, 8.

[4] Adjusted for inflation, per the U.S. Bureau of Labor Statistics, this award would be $808,428 in

(awarding $200,000 compensatory damages and $15,000 exemplary damages for being audiotaped and videotaped during intimate moments without consent)[5]; Ex. Q, *John and Jane Doe v. Patrick Kaiser*, 2007 Jury Verdicts LEXIS 117998 (awarding Jane Doe $150,000 compensatory damages, $25,000 punitive damages for being videotaped in private, intimate moments without consent)[6]; Ex. R, *Heather Bradbury v. Alan Kendrick*, 2005 MD Metro Verdicts Monthly LEXIS 655 (awarding $301,275, which included $200,000 in punitive damages for being videotaped without consent while showering at home of a family friend).[7]

Consistent with these settlement and jury verdicts and the evidence supporting her trauma, Plaintiff seeks $253,142.00 in emotional distress damages as a result of Defendants' actions.

### C. This Court Should Award Plaintiff $3,505.00 for the Cost of Past Treatment.

From September 2022 through October 2024, Plaintiff received mental health treatment from Stephanie J. Christl, a certified health and wellness coach at Christl Coaching and Trauma, Inc. Christl. Decl. ¶ 2. Plaintiff first came to Christl following the encounter with Allen in Las Vegas because she was "struggling in her relationships, has anxiety, couldn't sleep, didn't feel like herself, her whole world had fallen part and was struggling in life … she's so shut down." Ex. L at 18:9-25. The goal of the sessions was to "try to get [Plaintiff] back to who she was," with the encounter with Defendant Allen in Las Vegas being the "big" trauma addressed during the therapy sessions. *Id.* at 21:4-16.

---

past pain and suffering and $1,212,642.64 in future pain and suffering in 2025 dollars. *See CPI Inflation Calculator*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/data/inflation_calculator.htm (last accessed September 3, 2025).

[5] Adjusted for inflation, per the U.S. Bureau of Labor Statistics, this award would be $357,156.44 in compensatory damages in 2025 dollars. *Id.*

[6] Adjusted for inflation, per the U.S. Bureau of Labor Statistics, this award would be $230,709.02 in compensatory damages in 2025 dollars. *Id.*

[7] Adjusted for inflation per the U.S. Bureau of Labor Statistics, this award would be $171,561.02 in compensatory damages in 2025 dollars. *Id.*

Plaintiff attended 14 sessions with Christl, ranging from 1.5 to 2 hours each session. Ex. M. The majority of the sessions were just Plaintiff, but 2 sessions (4 hours total) included Plaintiff's boyfriend—these couples' sessions were "to treat the symptoms of that issue [trauma from Las Vegas] that was showing up in their relationship." Ex. L at 61:24-62:11; Ex. M. All sessions were necessary to treat Plaintiff's trauma, Christl. Decl. ¶ 3, and Plaintiff was charged Christl's standard hourly rate of $150.00 per hour, for a total of 23 hours or $3,450.00. *See* Ex. L, Christl Dep. at 20:11-22; Ex. M, Christl Hourly Statement.

On September 7, 2022, and March 4, 2024, Plaintiff also received mental health treatment from Advanced Psychiatry for a total of $55.00 out of pocket. Ex. S, Transaction Report.

Thus, Plaintiff seeks $3,505.00 for the cost of past treatment required as a result of the trauma from the Las Vegas encounter with Allen.

### D. This Court Should Award Plaintiff $340,200.00 for the Cost of Future Treatment.

The cost of future treatment is based on the recommendations of Plaintiff's mental health provider, Stephanie J. Christl. During the course of Plaintiff's trauma therapy, Christl explained that Plaintiff's progress was slow. Ex. L at 36:10-14. As such, Christl identified that Plaintiff requires ongoing trauma therapy and also recommended "body work" to aid with Plaintiff's extreme dissociation. *Id.* at 37:25-38:3; 51:9-52:8; *see also* Christl. Decl. ¶ 7. When asked about the timeline for Plaintiff's recovery, Christl explained that it is "constant work," Ex. L at 54:17-24, and Plaintiff's treatment should continue until Plaintiff learns how to relinquish her avoidant coping style and tolerate the upsetting memories of her trauma. Christl. Decl. ¶ 7.

For Plaintiff, Christl recommends an initial treatment plan of individual trauma therapy sessions twice weekly (96 sessions per year) for 1 year, then individual trauma therapy sessions once a week for 3 years (48 sessions per year), then individual trauma therapy sessions once a

month for 6 years. Christl. Decl. ¶ 7. Additionally, during this initial phase of treatment, Christl recommends family or couples' therapy twice a month (24 sessions per year) for 10 years. *Id.* Following this initial treatment phase, Christl recommends maintenance treatment of individual trauma therapy (12 sessions per year) until age 81 and couples or family therapy (12 sessions per year) until age 81.[8] *Id.* This is consistent with Christl's recommendations for clients exhibiting similar trauma responses to Plaintiff.[9] *Id.*

Plaintiff assumes Christl's rate of $150.00 per hour for the individual trauma and couples/family therapy sessions, with an average session length of 1.5 hours. This is consistent with the average cost of trauma therapy[10] and Plaintiff's prior sessions with Christl. Ex. M.

**Initial Treatment Plan**

| Type of Therapy | No. of Sessions/ Year | Length of Session | Cost | No. of Years | Total |
|---|---|---|---|---|---|
| Individual Twice Weekly Trauma Therapy Sessions | 96 | 1.5 hours | $150.00/hour | 1 | ($150.00 x 1.5) x 96 = $21,600 |
| Individual Trauma Therapy Sessions Weekly | 48 | 1.5 hours | $150.00/hour | 3 | ($150.00 x 1.5) x 48 x 3 = $32,400 |
| Individual Trauma Therapy Sessions | 12 | 1.5 hours | $150.00/hour | 6 | ($150.00 x 1.5) x 12 x 6 = $16,200 |

---

[8] Christl's treatment recommendations are based on the average life expectancy for a female of 81 years per the Centers for Disease Control and Prevention. *See* Christl Decl. ¶ 7, fn 2.
[9] For clients with similar trauma responses to Plaintiff, Christl recommends bi-weekly trauma sessions for several months before moving to weekly sessions and then every other week. Ex. L at 53:17-21; 55:3-9. As clients attend regular trauma therapy and develop coping strategies, they may reach the point where only "tune-up[]" sessions are required, typically caused by a triggering event. *Id.* at 55:3-9.
[10] *See e.g.*, Ashley Lauretta, *How Much Does Therapy Cost In 2025*, FORBES (May 15, 2024), https://www.forbes.com/health/mind/how-much-does-therapy-cost/ ($100-$200 per session) (last visited Sept. 5, 2025); Tyler Woods, *How Much Does Therapy Cost*, PSYCHOLOGY TODAY (August 30, 2023), https://www.psychologytoday.com/us/basics/therapy/how-much-does-therapy-cost (same) (last visited Sept. 5, 2025); Nicole Arzt, LMFT, *How Much Is Couples Therapy? Is Couples Therapy Covered By Insurance?*, CHOOSINGTHERAPY.COM (July 19, 2023), https://www.choosingtherapy.com/how-much-is-couples-therapy/ ($100-$250) (last visited Sept. 5, 2025).

| Monthly Couples/ Family Therapy | 24 | 1.5 hours | $150.00/hour | 10 | ($150.00 x 1.5) x 24 x 10 = $54,000 |
|---|---|---|---|---|---|
| | | | | | **= $124,200.00** |

**Maintenance Treatment Plan**

| Type of Therapy | No. of Sessions/ Year | Length of Session | Cost | No. of Years | Total |
|---|---|---|---|---|---|
| Individual Trauma Therapy Sessions | 12 | 1.5 hours | $150.00/hour | 40 | ($150 x 1.5) x 12 x 40 = $108,000 |
| Couples/ Family Therapy | 12 | 1.5 hours | $150.00/hour | 40 | ($150 x 1.5) x 12 x 40 = $108,000 |
| | | | | | **= $216,000.00** |

Thus, Plaintiff seeks $340,200.00 for the cost of future treatment as a result of the trauma from the Las Vegas encounter with Allen.

### E. This Court Should Award Plaintiff $1,193,694.00 in Punitive Damages.

"Ordinarily, the Court may award punitive damages as part of a default judgment." *Perry v. Or. Healthcare, LLC*, No. 3:22 CV 1512, 2023 U.S. Dist. LEXIS 13710, at *12-13 (N.D. Ohio Jan. 26, 2023) (internal citations omitted). Tennessee law has long determined that punitive damages are available for the offenses of assault and battery. *See e.g.*, *Pease v. Alford Photo Indus., Inc.*, 667 F. Supp. 1188, 1203 (W.D. Tenn. 1987) (considering state torts of assault, battery, IIED, invasion of privacy, and outrageous conduct and awarding punitive damages due to Defendant's outrageous conduct).

Having entered judgment against Allen and ADT, all Plaintiff's well-pleaded allegations—including as to battery, assault, invasion of privacy, intentional infliction of emotional distress, negligent failure to warn, and negligent hiring, retention, or supervision—are deemed admitted. *Ford Motor Co.*, 441 F. Supp. 2d at 846 (citing *Visioneering Constr.*, 661 F.2d at 124). Moreover, Defendants' predatory conduct, as detailed herein, is not the kind of conduct tolerated in a civilized

13

Case 3:23-cv-00582    Document 88    Filed 09/08/25    Page 13 of 16 PageID #: 717

society and resulted in serious emotional and psychological injury to Plaintiff. *See generally* Christl. Decl. Under similar circumstances, courts have awarded punitive damages. *See* Exs. O-R (awarding punitive damages ranging from $15,000 to $2,000,000). Courts in this circuit have awarded punitive damages at a "2x" multiplier of a Plaintiff's compensatory damages. *See e.g., Perry*, 2023 U.S. Dist. LEXIS 13710, at *12-13. Thus, Plaintiff seeks $1,193,694.00 to deter Defendants from such conduct in the future and redress the wrongs to Plaintiff.

## IV. CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that this Court:

1. Award Plaintiff damages in the amount of $1,790,541.00, which consists of $253,142.00 in emotional distress damages, $3,505.00 in past treatment expenses, $340,200.00 in future treatment expenses, and $1,193,694.00 in punitive damages.

2. Award post judgment interest at the rate mandated by 28 U.S.C. § 1961, from the date the award of damages and final judgment is entered by this Court to the date the judgment is paid in full by Defendant.

Dated: September 8, 2025

Respectfully submitted,

/s/ Elizabeth A. Fegan
Elizabeth A. Fegan (admitted *pro hac vice*)
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
(312) 264-0100
beth@feganscott.com

John T. Spragens (BPR # 31445)
S<small>PRAGENS</small> L<small>AW</small> PLC
311 22nd Ave. N.
Nashville, TN 37203
(615) 983-8900
john@spragenslaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Elizabeth A. Fegan, an attorney, caused the foregoing to be filed on September 8, 2025, via the Court's electronic filing system which will serve all counsel of record, including:

Alandis K. Brassel (BPR # 34159)
(615) 258-8900
alandis@brassel.law

Robert Housman
9001 Clifford Ave.
Chevy Chase, MD 20815
(202) 486-5874
rhousman@bookhillpartners.com

Counsel for Defendants Jimmie Allen and
Aadyn's Dad Touring, Inc.

Dated: September 8, 2025 By: */s/ Elizabeth A. Fegan*