**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| JANE DOE 2, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 2023-cv-00582 |
| | ) | |
| v. | ) | |
| | ) | |
| JIMMIE ALLEN, AADYN'S DAD TOURING, INC., CHARLES HURD, and JOHN DOES 1-100, | ) ) ) | JUDGE ALETA A. TRAUGER |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF ELIZABETH A. FEGAN IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR DAMAGES RESULTING FROM DEFAULT JUDGMENT**

I, Elizabeth A. Fegan, declare, under penalty of perjury, as follows:

I am counsel for Plaintiff and am primarily responsible for prosecuting this matter. I have full knowledge of the matters stated herein and could and would testify hereto.

Attached as **Exhibit A** hereto are true and correct excerpts of the Deposition of Kayla Suezanne Welsh conducted on September 20, 2024.

Attached as **Exhibit B** hereto are true and correct excerpts of the Deposition of Nikkey Hemington conducted on September 27, 2024.

Attached as **Exhibit C** hereto are true and correct excerpts of Instagram direct messages between Plaintiff and Defendant Jimmie Allen.

Attached as **Exhibit D** hereto are true and correct excerpts of the Deposition of Kate Seegmiller conducted on September 24, 2024.

Attached as **Exhibits E-H, J-K** hereto are true and correct excerpts of text messages between Plaintiff and Defendant Jimmie Allen.

Attached as **Exhibit I** hereto are true and correct excerpts of text messages between Plaintiff and Nikkey Hemington.

Attached as **Exhibit L** hereto are true and correct excerpts of the Deposition of Stephanie J. Christl conducted on October 21, 2024.

Attached as **Exhibit M** hereto is a true and correct copy of the dates and lengths of Plaintiff's trauma therapy sessions with Stephanie J. Christl.

Attached as **Exhibit N** hereto is a true and correct copy of Stephanie J. Christl's summary of Plaintiff's mental health condition.

Attached as **Exhibit O** hereto is a true and correct copy of *Jane Doe and John Doe v. Kevin Moncla*, 2006 Jury Verdicts LEXIS 44059, 2004-CA-000374.

Attached as **Exhibit P** hereto is a true and correct copy of *JoAn Couche v. John Coons*, 2002 Jury Verdicts LEXIS 55522.

Attached as **Exhibit Q** hereto is a true and correct copy of *John and Jane Doe v. Patrick Kaiser*, 2007 Jury Verdicts LEXIS 117998.

Attached as **Exhibit R** hereto is a true and correct copy of *Heather Bradbury v. Alan Kendrick*, 2005 MD Metro Verdicts Monthly LEXIS 655.

Attached as **Exhibit S** hereto is a true and correct copy of Plaintiff's transaction report for her sessions at Advanced Psychiatry.

I declare that the foregoing is true to the best of my ability.


Dated:  September 8, 2025

_____

Elizabeth A. Fegan

# EXHIBIT A
# REDACTED

1

2                UNITED STATES DISTRICT COURT

3            FOR THE MIDDLE DISTRICT OF TENNESSEE

4

5  JANE DOE 2,                        )
                                      )
6            Plaintiff,               )
                                      )
7       vs.                           )  No. 3:23-cv-00582
                                      )
8  JIMMIE ALLEN, AADYN'S DAD          )  CONFIDENTIAL
   TOURING, INC., CHARLES HURD,       )  TRANSCRIPT
9  and JOHN DOES 1-100,               )
                                      )
10           Defendants.              )
   _____)

11

12

13

14       DEPOSITION OF KAYLA SUEZANNE WELSH, a witness

15       herein, noticed by FEGAN SCOTT LLC, conducted

16       remotely via Zoom, at 11:01 a.m., on Friday,

17       September 20, 2024, before Kathryn D. Jolley,

18       CSR 11333.

19

20

21       Job Number PA 6923986

22

23

24

25

1  Dad Touring, Incorporated.

2      THE VIDEOGRAPHER:  And with that, will the court

3  reporter please swear in the witness, and we can begin.

4

5                  KAYLA SUEZANNE WELSH,

6  a witness herein, having been sworn, testifies as

7  follows:

8

9                  -EXAMINATION-

10

11     BY MS. FEGAN:

12     Q.  Good morning.  I -- My name's Beth Fegan.  I

13  represent the Plaintiff in this matter.  I just thought

14  we'd go over a couple of the ground rules for the

15  deposition.  It'll make it easier as we go along.

16     If you ever need a break, just let us know, and we

17  can go off the record.  It's not supposed to be a

18  marathon, so, you know, just let us know.

19     A.  Okay.

20     Q.  The court reporter can only take down words from

21  one of us at a time.  So pause while I'm speaking.  I'll

22  pause while you're speaking.

23     From time to time, Mr. Brassel might object to my

24  questions.  So before you answer, give him a moment and

25  the opportunity to object.  If he objects, that's for the

1    And it's okay to use her name, but we will ask that those

2    portions of the deposition be marked confidential later

3    if that happens.

4        But when I refer to "Plaintiff," do you understand

5    who I'm referring to?

6        A.  Yes.

7        Q.  And who is that?  You can say her name.

8        A.  ██████

9        Q.  And what is ██████ last name?

10       A.  ██████

11       Q.  Okay.  How do you know Plaintiff?

12       A.  She's been my best friend for like 20 years.

13       Q.  And how would you describe Plaintiff in early

14   2022?  How would you describe her demeanor and her

15   personality?

16       A.  She's -- I mean, in general, she's just a funny,

17   like, confident, silly girl.  She just likes to -- We

18   have, like, a lot of fun together.  She's just very

19   herself all the time.

20       Q.  In May 2022, did you have an opportunity to

21   travel with Plaintiff?

22       A.  Yes.

23       We went to Nashville on Memorial Day weekend.

24       Q.  Do you recall the date that you left to go to

25   Nashville?

```
1        A.  Not off the top of my head.  I believe it was

2    a -- a Wednesday night, I believe, or a Thursday night.

3    It -- But it was Memorial -- Memorial Day weekend of

4    2022.

5        Q.  Does May 1st, 2022 sound about right to you?

6        A.  Yes, around, yeah.

7        Q.  And where were you flying from to get to

8    Nashville?

9        A.  We flew from Sacramento Airport to -- We had a

10   layover in Chicago, and then we flew to Nashville.

11       Q.  And who was -- who were you traveling with?

12       A.  I was traveling with ███████████  Nikkey

13   Hemington, and then our friend Christina Corsaletti.

14       Q.  Were you all on the flights together?

15       A.  Yes.

16       Q.  Did anything happen on those -- Or what happened

17   on the flights or on a flight?

18       A.  The Sacramento to Chicago, very uneventful.  The

19   Chicago flight is where we met Jimmie Allen.  He was

20   across the row from myself and ██████  And then we kind

21   of had small talk there and just kind of -- just small

22   talk on the plane.

23       Q.  Did Mr. Allen tell you -- tell you anything

24   about himself?

25       A.  No.
```

```
 1        Q.   And then what happened?

 2        A.   Do you want me to tell, like, exactly?

 3        Q.   Well, what -- So you were -- You got off the

 4   plane.

 5        Did anything -- What happened next?

 6        A.   Okay.

 7        Q.   Okay.

 8        A.   So we -- He was asleep on the plane, and we were

 9   all getting ready to unload.  And he was, like, sound

10   out -- or sound sleep.  So I -- I told ███████ like,

11   "Just shake him a little."  We're like, "Wake up,

12   princess," and he woke up, and we all were getting off

13   the plane.

14        And then at baggage claim, his manager or assistant

15   or something, he came up to us and said, "Hey, Jimmie

16   thought you guys were really funny.  He wants to see if

17   he could" -- or "wanted to take you guys out for a

18   drink," or something like that, or "meet up with you

19   tonight."

20        And so ██████ exchanged Instagrams with his manager,

21   and then they were chat --

22        Q.   Okay.  So let's break that down.

23        So you get off the plane, and you go to baggage

24   claim, and it's the four women that you were traveling

25   with or --
```

1      A.  Yes.

2      Q.  -- including you.  And a gentleman comes up to

3  you that you think was his manager.

4      Why do you think it was Mr. Allen's manager?

5      A.  I believe he said that to ████ and Christina.

6  I was getting bags at the moment, and so they -- He came

7  up to them and got -- I believe he said, "I'm Jimmie

8  Allen's manager.  Jimmie thought you were really funny."

9      And at that point, I had no idea who he was.  I

10  don't listen to country music very often.  So I would --

11  I have -- I had no clue who any of them were.

12      Q.  Okay.  So you're in Nashville.

13      Where are you staying?

14      A.  We stayed at my -- my friend's house.

15      Q.  Okay.  Did you see Mr. Allen after the airport?

16      A.  Yes.

17      We met up with him at -- I believe it was Legends

18  bar that night.

19      Q.  Do you recall what time that was?

20      A.  I believe it was around 11:00.

21      Q.  And did you go to Legends to meet Mr. Allen, or

22  did Mr. Allen come to Legends to meet you?

23      A.  He came to Legends to meet us.

24      Q.  What happened at Legends, or did you speak with

25  Mr. Allen?

Case 3:23-cv-00652-DSC  Document 89-1  Filed 09/26/25  Page 9 of 105  PageID # 9640

1    A.  Not really.  It was very brief.

2    I FaceTimed my mom because she said that she saw him

3  on American Idol after I told her that we met him or --

4  and so spoke to him briefly.

5    And then he was talking to our friend Christina a

6  lot of the night because she's a huge country music fan.

7  He bought us a round of shots, and then he -- he left

8  pretty quickly.  I would say he was maybe there for 45

9  minutes.

10    Q.  Was he wearing his wedding ring?

11    A.  I don't remember that.

12    I -- But I do remember my friend Christina asked

13  him, "Are you married."

14    And he said, "We're separated."

15    Q.  Okay.  You said that he left after about 45

16  minutes?

17    A.  Yeah, I -- I believe it was about 45 minutes.

18    Q.  And nothing else happened that evening with

19  Mr. Allen; is that right?

20    A.  He might have FaceTimed ███████ that night.  It

21  was either that night or the next night they FaceTimed,

22  but it -- I -- it might have been that night.

23    Q.  And when you say he FaceTimed, were you in the

24  room so that you could see that --

25    A.  Yes.

Case 3:23-cv-00582   Document 89-21   Filed 09/08/25   Page 10 of 105 PageID #: 9541

1    with Mr. Allen after that weekend?

2         A.  Yes.

3         Q.  And what is that understanding based on?

4         A.  They were texting, FaceTiming, sending pictures

5    at least every day as far as I'm concerned -- as far as I

6    remember.

7         They -- My assumption, and I believe ██████too,

8    was that they were kind of either like in the talking

9    phase or kind of dating each other.

10        Q.  Is that something that Plaintiff told you?

11        A.  Yes.

12        Q.  Did there come a time where the Plaintiff

13   planned to see Mr. Allen again?

14        A.  Yes.

15        Q.  And did she share that with you?

16        A.  Yes.

17        Q.  What did she tell you before she -- while she

18   was planning to see him?

19        A.  She said that he was planning on taking her to

20   Vegas for Fourth of July weekend, and he was planning on

21   flying her out there.

22        Q.  Did she tell you anything else about their

23   plans?

24        A.  She told me that there was the possibility that

25   they were going to fly to Portland after that as well.

Case 3:23-cv-00582   Document 89-1   Filed 09/08/25   Page 11 of 105 PageID # 9542

1    Q.  Did she share with you whether she planned to

2  stay with Mr. Allen?

3    A.  She told me that she -- or he was going to get

4  them separate rooms, and she was pretty adamant on not

5  staying with him that night.

6    Q.  Did she tell you why?

7    A.  She just wanted it for comfort and just so

8  nothing was to happen.

9    Q.  Did you speak with her while she was in

10  Las Vegas?

11    A.  Yes, I did.

12    Q.  When did you speak with her?

13    A.  We were texting throughout the day, just -- she

14  was sending me pictures of them.  And we -- she would

15  send me text messages of "He keeps telling people I'm his

16  girlfriend."  She seemed very excited.

17    At one point he had her phone and Faced -- like, I

18  was FaceTiming her, and he took the phone, and we talked

19  very briefly.  They were gambling.

20    Q.  Do you recall what you talked about with

21  Mr. Allen?

22    A.  I believe he -- I can't remember exactly, but I

23  believe he was -- he picked her up, like, from the

24  airport, so it was kind of banter.

25    Q.  Was that -- Was this -- Were you texting and had

```
1   missed call, or you woke up because the phone was

2   ringing?

3       A.  The phone rang.

4       Q.  Okay.  And when you answered the phone, it was

5   Nikkey?

6       A.  Yes.

7       Q.  And who is Nikkey?

8       A.  Nikkey is our other best friend that was aware

9   of the situation as well.

10      Q.  And what is Nikkey's last name?

11      A.  Hemington.

12      Q.  What did Nikkey tell you?

13      A.  She told me that ███████ was in a panic, that she

14  needed to find a hotel room, and she -- she didn't really

15  go into too much detail because we were -- She was just

16  so frantic on the other line.

17      Q.  Nikkey was frantic?

18      A.  ███████ was frantic, and we were trying to figure

19  out.  She told me that ██████was in a taxi heading to --

20  they're trying to find a hotel room to stay in for the

21  night.

22      Q.  And what happened next?

23      A.  I believe I called ██████to see what was going

24  on, and she told me that she had just got into a hotel

25  room, and she would call me when she checked in.
```

Case 3:23-cv-00582   Document 89-1   Filed 09/08/25   Page 13 of 105 PageID #: 9554

```
1      Q.  Did she tell you during that conversation what
2   happened?
3      A.  It was a very brief, like, "I had to leave.
4   I'll call you when I get -- when I get settled in."
5      Q.  Was she -- Did her voice sound upset during
6   this --
7      A.  Yes.
8      Q.  -- first conversation?
9      A.  Sorry.  Yes.
10     Q.  Did it sound like she was crying?
11     A.  No, it -- She just sounded very shaky.
12     Q.  Did you speak with ████ again after that brief
13  conversation?
14     A.  Yes.
15     Q.  When was the next time you spoke with her?
16     A.  After she checked into her ho- -- her hotel
17  room, we -- she gave kind of a rundown of what happened.
18     Q.  Do you know what hotel she went to?
19     A.  I don't know exactly, but I believe it was like
20  a Holiday Inn or something like that.
21     Q.  And so after she checked in, did she call you
22  and Nikkey?
23     A.  Yes.
24     Q.  And so you were on a three-way conference call?
25     A.  Yes.
```

```
 1        Q.  And what did ████ tell you during this
 2    three-way call after she checked in?
 3        A.  She told us everything that happened.
 4    Do you want me to tell you exactly?
 5        Q.  Yeah.  So if you --
 6        A.  Okay.
 7        Q.  -- can tell me what she shared, that would be
 8    great.
 9        A.  Yeah.  Yeah.  She told me that they went back to
10    the room, and they were at one point on the balcony area.
11    And she was looking over -- like, they were both looking
12    over the city, I guess, and he said something along the
13    lines of "Stay right here.  Don't turn around.  I have a
14    surprise for you."
15        And so she stayed right there, and then he came
16    back, and they started making out.
17        I believe then they went to the bedroom, like to the
18    bed, and they had sex, and she was saying that he was
19    saying some weird comments throughout sex.  And then
20    after they finished, she went to go get -- or she tried
21    to wake him up.
22        She said, "Jimmie, like, I need" -- "I need you to
23    get me a room.  You said you were going to get me a room.
24    Where is it?"
25        And he wouldn't wake up.  He was sound asleep.  So
```

1   she, like, shook him multiple times, and he didn't wake

2   up.

3       So she got up and went to the bathroom, and she said

4   that she saw a reflection in the closet where she saw his

5   phone propped up on the ironing board.  And she left --

6   grabbed all of her stuff and left in a panic.

7       Q.  Did she tell you -- Was the phone just sitting

8   on the ironing board not on?

9       A.  No.  It was recording everything.

10      Q.  Did she tell you what she did when she saw the

11  phone recording?

12      A.  She grabbed the phone, and then immediately, I

13  believe, she deleted the video.  And then I think that's

14  when she packed up and left with the phone.

15      Q.  Did she tell you why she took the phone?

16      A.  She wanted to make sure it was deleted, and I

17  think that was the only real reason.

18      Q.  When you were talking to her in this second

19  conversation, how did she sound?

20      A.  She hold it together pretty well in that moment.

21  She was just kind of shaken up, and she just said that

22  she wanted to sleep.  She was very -- You could tell --

23  As -- As her friend, I could tell that she was rattled

24  for sure, but she was just like "I need to go to sleep.

25  I have" -- "I need to find a flight to go home tomorrow."

1    Q.  Did you talk to her again the next morning?

2    A.  Yes.

3    Q.  And did she share any other information with you

4    about what happened?

5    A.  Just more like detailed stuff, like what he was

6    saying and just kind of going into more depth of what

7    happened the night before.

8    Q.  And did she share with you how she was feeling

9    at that time?

10   A.  She, I think, was in shock, and she was just

11   saying she wanted to go home, and she just was very

12   tired.

13   Q.  As somebody who's known her for a long time,

14   what are the things that you have observed in terms of

15   how this -- how the incident affected her?

16   A.  She definitely -- She -- Like I said, she holds

17   it together pretty well, but she definitely started

18   partying more.

19       She met her current boyfriend the next day, and they

20   like fell in love, which wasn't true, and she immediately

21   wanted to have a baby, like, just things that you -- you

22   don't -- she doesn't do, like, normal.  Like, that wasn't

23   something that she would ever say.

24       I know that her anxiety got worse.  Just I -- She

25   just kind of -- little more man- -- like manicky.

Case 3:23-cv-00582 Document 892-1 Filed 09/08/25 Page 17 of 105 PageID # 9548

1  STATE OF CALIFORNIA ) ss

2

3      I, Kathryn D. Jolley, CSR 11333, do hereby declare:

4

5      That, prior to being examined, the witness named in

6  the foregoing deposition was by me duly sworn pursuant to

7  Section 2093(b) and 2094 of the Code of Civil Procedure;

8

9      That said deposition was taken down by me in

10 shorthand at the time and place therein named and

11 thereafter reduced to text under my direction.

12

13     I further declare that I have no interest in the

14 event of the action.

15

16     I declare under penalty of perjury under the laws of

17 the State of California that the foregoing is true and

18 correct.

19

20     WITNESS my hand this 6th day of

21 October, 2024.

22

23

Kathryn D. Jolley, CSR 11333

24

25

# EXHIBIT B
# REDACTED

1                UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF TENNESSEE

3                        - - -

4

5    JANE DOE 2,

6                    Plaintiff,

7            vs.                        No. 3:23-cv-00582

8    JIMMIE ALLEN, AADYN'S DAD TOURING,

     INC., CHARLES HURD, AND JOHN DOES

9    1-100,

10                   Defendants.

     _____

11

12

13

14

15

16            REMOTE VIDEOTAPED DEPOSITION OF

17                  NIKKEY HEMINGTON

18            EL DORADO HILLS, CALIFORNIA

19              FRIDAY, SEPTEMBER 27, 2024

20

21

22   REPORTED BY:

23   ANITA A. SHENIAN

24   CSR NO. 12325

25   ASSIGNMENT NO. 6929808

1  the witness, and then we can begin.

2  　　　　　THE COURT REPORTER:  Thank you.

3  　　　　　My name is Anita Shenian.  I am a

4  code-compliant, California certified shorthand

5  reporter, and my license number is 12325.

6  　　　　　Ms. Hemington, raise your right hand,

7  please.

8  　　　　　THE WITNESS:  (The witness complies.)

9  　　　　　THE COURT REPORTER:  Do you solemnly swear

10  that the testimony you shall give in the cause now

11  pending shall be the truth, the whole truth, and

12  nothing but the truth?

13  　　　　　THE WITNESS:  I swear.

14  　　　　　THE COURT REPORTER:  Thank you.

15  　　　　　Please proceed.

16

17  　　　　　　　　　NIKKEY HEMINGTON,

18  　　　having been first duly sworn, was examined

19  　　　　　　　and testified as follows:

20

21  　　　　　　　　　EXAMINATION

22

23  BY MS. FEGAN:

24  　　　Q.  Good morning, Ms. Hemington.  I represent

25  ████████████ in this matter.  And so I'm going to

Case 3:23-cv-00582   Document 89-21   Filed 09/08/25   Page 21 of 105 PageID #: 9652

1      A.   Maiden name, Wagner, W-A-G-N-E-R.

2      Q.   And does ███████ still sometimes refer to

3 you as Nikki Wagner?

4      A.   Yes.  She hates that our last names

5 changed; so...

6      Q.   Okay.  How long have you known ██████████?

7      A.   I've known her since seventh grade, I

8 believe, junior high, uh-huh.

9      Q.   Did you go to school together?

10      A.   Yeah, for one year.

11      Q.   I'd like to take you to 2022.  Did you go

12 on a trip with ██████████ in 2022?

13      A.   Yes.  We went to Nashville in 2022 with

14 our other best friend Kayla and my cousin Christina.

15      Q.   When did you go to that trip to Nashville?

16      A.   It was summer, I believe.  I don't

17 remember the dates of that trip.

18      Q.   Does it sound right, about Memorial Day

19 weekend?

20      A.   Yes.

21      Q.   Okay.  And tell me a little bit about who

22 ████████ was at that time in terms of her personality,

23 in terms of her outlook on life.

24      A.   ████████ was very -- she's fun, outgoing.

25 She was the only one in our group who was single.

1   We were all -- I was married.  My cousin Christina,
2   part of it we were celebrating her engagement.  And
3   then Kayla had been with her significant other for
4   years at that point.  And so ████████ was single, and
5   so she is very pretty.  So she gets a lot of
6   attention.
7            And so, yeah, we -- she was just fun.  It
8   was a fun, light-hearted trip, and that's kind of
9   how she was all the time.  She was -- people --
10  she's the kind of person everyone thinks they're her
11  best friend.  She was very kind; so, yeah.
12       Q.   And she's -- she was generally a happy
13  person?
14       A.   Yes.
15       Q.   On the flight there, on the way to
16  Nashville, did something happen?
17       A.   On the flight there, Kayla, we didn't
18  recognize who the guy in first class was.  It was a
19  small plane.  He slept the whole time, had his hood
20  on.
21            And so Kayla, when we were landing, he was
22  not waking up, and so Kayla tapped him, was like,
23  "Wakie, wakie, it's time to get off."
24            And he turned over.  We didn't know who he
25  was.  We just knew at the airport, he was with a

Case 3:23-cv-00582   Document 89-1   Filed 09/08/25   Page 23 of 105 PageID #: 9654

1    large group of guys.  And he was the only one who

2    was in first class.  They were all -- walked by us

3    to the back of the cabin.

4            And so she was kind of making jokes about

5    that to him, like, "Wow, way to ditch your friends,"

6    and stuff.  We had -- we didn't recognize who he was

7    at that point.

8        Q.   Did you have the occasion to speak with

9    him after you got off the plane?

10       A.   Yeah.  Once we got off the plane, we all

11   went and got our bags.  And at baggage claim is

12   where his security guard came and approached us.

13           And ██████ made a joke like, "Are you

14   trying to hit on me?"  Like, she was, like, "What

15   are you talking about?"

16           "No, I'm actually -- that was Jimmie Allen

17   on your flight.  He wants to get in contact with you

18   guys.  There's some party or something going on, and

19   see if you guys wanted to go."

20           And so all of us being married and in

21   relationships, it was ██████ that we were, like,

22   "You can get her contact information, but we're not

23   going to give you ours."  And so we were, like, "Oh,

24   that's so funny."

25           I didn't recognize him by his name or who

1   It wasn't anything big, but he just wanted to keep
2   talking to her and then they continued talking from
3   there.
4       Q.   Did █████ share with you that they
5   continued to talk over the next time period?
6       A.   Yeah.  I mean, we kept checking in because
7   it was very, just like, "Oh, my gosh, he's still
8   talking to you.  Like, he must actually be
9   interested in you."
10          She wasn't originally interested in him
11  that way, but I remember her saying, as the
12  conversation went and they continued to talk, that
13  he was -- "No, I think he really likes me.  He's
14  telling me all these like" -- "he's being so
15  respectful.  He's telling me he wants a family with
16  me."
17          Like it escalated pretty quickly.
18      Q.   So just to walk through some of that, did
19  she explain to you how or why she thought that
20  Jimmie was being respectful?
21      A.   She said that he was just being really
22  nice to her, that he wasn't, like, being -- like,
23  that their messages weren't -- he wasn't being pushy
24  in their messages, which made her feel more
25  comfortable about him.

1      Q.   And you said, "It escalated pretty quick."
2   What do you mean?
3      A.   Just that like it went from being more of
4   like, "Oh, this is funny.  Maybe you'll talk to him
5   for like a week and then it'll die off" to, like,
6   "Oh, it actually seems like he wants you to come and
7   do things with him."
8           He started -- that's when he started
9   inviting her to Vegas, I think.  And she was
10  actually thinking about going, which we were like,
11  "I mean, he has security.  Like it seems safe
12  enough."
13          And so she -- yeah, it wouldn't -- I mean,
14  it was only like a very short time frame between the
15  two things happening, for her to be flying out to
16  see him.
17     Q.   And before she did that -- or let me start
18  over.
19          You mentioned that she said that he wanted
20  to have a family with her.  Can you tell me a little
21  bit more about what she shared with you?
22     A.   So he had -- she had seen, like, a post of
23  his wife's that they were still together, like, a
24  post on social media.  And so she started
25  questioning him about that.

Case 3:23-cv-00582 - Document 89-1 - Filed 09/02/25 - Page 26 of 105 PageID #: 9687

1          And he was, like, "No, that was" -- "we
2   have to do this for the kids.  It's not what it's
3   like," and convinced her that it wasn't what it was.
4   And so she believed him, and there were texts and
5   they FaceTimed quite a bit.
6          And so at first she didn't believe him,
7   then he was able to convince her that like because
8   he's in -- like because she wants to stay with him,
9   it was posted, but he doesn't feel the same way, and
10  he made that very clear.
11         And so that was, I think, pretty close
12  before she went to Las Vegas.  So she was kind of
13  hesitant about things, which is why I think she was
14  much more on the -- Like, I definitely want my own
15  hotel room.
16         But he -- yeah, he had just made comments
17  of, like, "No, you're my dream girl.  You're
18  everything I've ever wanted."  Like, telling her he
19  wanted to have a life with her.
20     Q.    Did she -- in advance of the Vegas trip,
21  did she share with you the plans for the trip?
22     A.    Yes.  She told me that she was going to
23  fly out to Vegas after work.  He was in some golf
24  tournament -- not golf -- I mean bowling tournament.
25         And then they were going to get on a

1  plane, a private plane, and he had asked her name
2  and stuff to put down on the list for the plane to
3  Oregon, I believe, to continue something else with
4  him.
5        So she was going to spend a few days with
6  him.  I don't think there was, like, a clear hard
7  plan, but that he was going to get her her own room
8  and all that stuff was what I was told before she
9  went.
10     Q.   So you mentioned a couple of times that
11  she was -- or he was going to get her her own room.
12  Is that something she shared with you?
13     A.   Yeah.  Because she was a little hesitant
14  about the whole wife thing, and so she knew they
15  were going to be in public together, and she was
16  comfortable with that.
17        But she didn't want to move that quickly
18  and him just assume that she was going to share a
19  room with him, and that's what the trip was going to
20  be about.
21     Q.   Okay.  Do you recall approximately when
22  she went to Las Vegas?
23     A.   It was -- I remember he invited all of us
24  to an event on Father's Day; so it was after that.
25  I don't remember the exact date range.

```
 1        Q.   Would the first weekend in July sound
 2   right to you?
 3        A.   Yeah, yeah.
 4        Q.   Around July 1st?
 5        A.   Uh-huh.
 6        Q.   Is "uh-huh" "yes"?
 7        A.   Yes.
 8        Q.   Perfect.  And so she gets to Vegas.  Do
 9   you hear from her?
10        A.   Yeah, she was texting us the whole time,
11   sending us screenshots of their texts.  Saying that,
12   like, he was introducing her to people as his
13   girlfriend; so he must not have been lying about his
14   wife, like he wasn't trying to like keep her a
15   secret or anything.
16             He was holding her hand, introducing her
17   to people out in public.  So she felt a lot more
18   comfortable.
19             She said that his security guard was
20   there, and so she felt, like, safe in this
21   situation.
22             Yeah, and then she was just sending us
23   screenshots of, like, "Oh, my gosh, look how nice,"
24   because she was sitting with a kid, and he was like
25   something about practicing for their own kids or
```

1    something like that.

2            But, yeah, she was texting me the whole

3    time she was there.

4        Q.   And did there come a time that night that

5    her texts to you or communications with you changed?

6        A.   I went to bed.  And the communication

7    changed when I got missed calls from her, and I woke

8    up to these missed -- until I answered because she

9    just kept calling.

10           And so it woke me up, and so I answered

11   and she was panicking on the other line.  So that

12   was when it changed.

13       Q.   And do you recall approximately what time

14   this was?

15       A.   I could look back.  I still have the text;

16   so I could look back at the time frames of

17   everything.

18           But it was definitely late in the middle

19   of the night because I was asleep.

20       Q.   So middle of the night, you wake up

21   because you hear the phone ringing.

22       A.   Uh-huh.

23       Q.   And it's ██████ on the other line?

24       A.   Yes.

25       Q.   And what does she say to you?

1  A. "I don't know what to do.  I don't know
2 what to do."
3    And I was, like, "Calm down.  Tell me
4 what's going on."
5    She's, like, "He was recording me."
6    And I was, like, "What are you talking
7 about?"
8    And she's, like, "I got up.  I found a
9 camera."
10    I can't remember the exact words, but
11 pretty much it's, like, "What do I do?  I tried to
12 shake him to wake him up.  I have the phone.  I took
13 it with me."
14    And I was just like "Get out of there."
15    She is like shaking.  She was telling me,
16 "I'm shaking and I don't know what to do.  I'm
17 panicking."
18    And I was like, "█████ if you don't feel
19 safe, you need to get out of that hotel.  I don't
20 want you sitting in that lobby.  Go to any other
21 hotel, find any other room, just get yourself safe
22 if you're feeling unsafe."
23    And she is like crying, saying how she
24 feels so dirty.  So she started walking down the
25 street.

1          And I was, like, "████████you have the

2    phone.  You need to turn it off.  Because if he

3    could" -- "it's his phone.  He can probably track

4    the location.  You need to feel safe.  So turn the

5    other phone off, go find a new hotel."

6          And so she is, like, "Okay," and starts

7    walking.

8          And I remember at one point, she's sitting

9    in a hotel lobby trying to charge her phone, and she

10   was crying.  And I was, like, "███████ we'll find

11   you a hotel room."

12         There were -- it was, like, impossible to

13   find a hotel room at that hour.  We were struggling.

14         And so I was, like, "I'm going to try to

15   find things closer to the airport for you so that we

16   can get you a flight and you can come home."

17         So at that point, we were looking for any

18   hotel that we can get her in at.  I'm trying to get

19   ahold of Kayla so that one of us is on the phone

20   with her the whole time.

21         And so we ended up finding her a hotel

22   room closer to the airport.  I know she was

23   panicking about needing Plan B.  She just wanted to

24   take a bath.  She said she felt very dirty.  She

25   kept repeating that.

1     So once she got to the hotel, there was a
2  Walgreen's close.  I was like, "We can figure this
3  out.  We can get you a" -- "we can get you a Plan B.
4  We are going to get it figured out, ████████  It's
5  going to be okay."  Like, we just wanted her to feel
6  safe in that moment.
7     And so Kayla and I were on the phone with
8  her at the same times at some points.  Kayla was on
9  the phone with her alone.  I was on the phone with
10 her alone at certain points.
11    But she -- once she was at the hotel room,
12 she was able to calm down, she took a bath.  She got
13 in bed.  And so we just figured, like, okay.  She is
14 safe.  We'll deal with this in the morning.
15    Q.   Okay.  So I'm going back over some of that
16 just because there was a lot there and that was all
17 really helpful.
18    A.   Uh-huh.
19    Q.   So when you -- when you first talked to
20 her, you said she was panicking.  Could you hear
21 that in her voice?  Can you describe for me what you
22 could hear besides her words?
23    A.   Yeah.  I mean, I've known ███████my whole
24 life, and I've never heard her so shaky and scared.
25 And so -- I mean, her voice was shaking.  She wasn't

1    making -- I mean, she was talking really fast.  She

2    was jumping from topic -- like, jumping around.  It

3    was not -- she was obviously panicking and was

4    scared.  You could hear it in her voice.

5              And she just kept saying she didn't know

6    what to do and just needed somebody to help, and so

7    I was the one who answered.

8        Q.   And was she crying this whole time that

9    you were speaking with her?  Just in parts?

10       A.   I can't say for sure that she was crying

11   because I couldn't see her face.  I just know her

12   voice was shaky like she was crying.

13       Q.   You cited she told you that she felt

14   dirty.  Did she --

15       A.   Yes.

16       Q.   -- multiple times.  Did she explain what

17   she meant?  Did she tell you more about that?

18       A.   Yeah.  As the night went on and the day,

19   she just kept saying she felt dirty because he --

20   she felt dirty because she felt, like, violated from

21   she said that night.  That was the big thing that

22   night, that she felt so violated and she felt taken

23   advantage of.

24             She started feeling dumb, is what she

25   said, for trusting him.  And then I know that she

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1  felt dirty because she said he didn't use a condom,

2  and she was very concerned about -- because she

3  wasn't on birth control so she was concerned,

4  needing Plan B.

5         And so there was a lot of different

6  reasons she listed for why she felt dirty.

7     Q.   Did she tell you how it made her feel to

8  discover that Jimmie was recording their sexual

9  encounter?

10    A.   Oh, yeah.  She said she felt completely

11 violated.  She was panicky.  She said she tried to

12 wake him up.

13        All she wanted was it deleted.  That was

14 her biggest thing, that she just wanted it deleted.

15 She didn't want anyone to ever know about it or see

16 it or -- she just was a lot of shame involved in

17 that moment.

18    Q.   Did she ever say that she took the phone

19 for any reason other than to make sure that the

20 video was deleted?

21    A.   No, she wanted the video deleted.  I think

22 had he -- she told me had he just still -- at that

23 point, she's like, "I just want him to give me the

24 pass code so I can delete the video and know it's

25 gone."

1     Q.    Anything else about -- anything else that

2     ███████ told you about how Jimmie Allen's recording

3     of her affected her?

4     A.    ███████ very self-conscious.  She is

5     beautiful, but definitely very self-conscious.

6     Doesn't see herself the way everyone else does.

7           And so she was embarrassed about what her

8     body would look like in -- there was a lot of

9     under -- it really sparked a lot of underlying

10    things in her.

11          She had an eating disorder when we were in

12    high school.  So I know she started trying to lose

13    weight.

14          There was a lot that came after that.  She

15    was just feeling terrible about herself.  Was very

16    scared about not just people seeing the video, but

17    how she looks in the video.  It sparked a lot of her

18    insecurities for sure.

19    Q.    Do you think it caused a reoccurrence of

20    her eating disorder?

21    A.    Yes.  Yeah.  She -- she kind of goes --

22    she's gone in and out of it ever since, yeah.

23    Q.    And what is her eating disorder?

24    A.    She just has some anorexia is probably the

25    best way to describe it, but, yeah, she just won't

```
 1   eat anything all day because -- and she was drinking
 2   more alcohol, and so she can't eat and drink at the
 3   same time or she gets sick.  So she started drinking
 4   a lot more, not eating, yeah.
 5        Q.   And before this July weekend with Jimmie
 6   Allen, had you seen any signs of her eating disorder
 7   in the recent past?
 8        A.   No, she was in a pretty good place before.
 9        Q.   And how about drinking, in terms of
10   drinking alcohol, but kind of the difference before
11   or after?
12        A.   Before she was definitely, like she'd go
13   out and stuff.  But the drinking definitely became
14   more of a problem where she wanted to be drinking,
15   like, every night after she got back.
16        Q.   And over time, so it's been two years now.
17   Have you seen that get better?
18        A.   She -- no, not really.  She -- yeah.  She
19   got pregnant with Rayne, and that was a really
20   difficult pregnancy emotionally for her.  And a lot
21   went on in that.
22             And the Jimmie stuff definitely came up in
23   ways that were triggering for both her and her
24   partner, some jealousy things with her and with
25   Rayne.
```

1          She never emotionally dealt with it.

2    Right away, she just drank, and they were partying

3    and drinking and stuff, that was really their

4    relationship up until she got pregnant.  She was

5    doing what she needed to do while she was pregnant.

6    But there were stints of time where she was living

7    at my house with me and my husband.

8          And emotionally, no, she has never been

9    well since that weekend she came home.  When she was

10   pregnant, she did her best.  She was really

11   struggling because she wasn't on any, like,

12   antidepressants or anything.  She couldn't sleep

13   during her pregnancy.  It was really hard on her

14   physically.

15          And then after her daughter was born, she

16   really just tried to push everything down to take

17   care of her daughter, and I would say in the last

18   month, all of the cracks that were showing in that

19   emotional time have come out where she is -- she

20   says she's just -- right now she says that she just

21   is like feels like her life's kind of blown up.

22          And the eating disorder, I suspect she is

23   very thin right now.  She is normally all about

24   where Kayla and I are at, she is very much tracking

25   us and even though we've been pregnant, she's been

Case 3:23-cv-00522   Document 89-1   Filed 09/08/25   Page 38 of 105 PageID #: 969

```
 1            STENOGRAPHIC REPORTER'S CERTIFICATE

 2

 3

 4         I, ANITA A. SHENIAN, CSR No. 12325, Certified

 5    Shorthand Reporter, certify;

 6         That the foregoing proceedings were taken by me

 7    remotely at the time and place therein set forth, at

 8    which time the witness was put under oath by me;

 9         That the testimony of the witness, the

10    questions propounded, and all objections and

11    statements made at the time of the examination were

12    recorded stenographically by me and were thereafter

13    transcribed;

14         That the foregoing is a true and correct

15    transcript of my shorthand notes so taken.

16         I further certify that I am not a relative or

17    employee of any attorney of the parties, nor

18    financially interested in the action.

19         I declare under penalty of perjury under the

20    laws of California that the foregoing is true and

21    correct.

22         Dated this 11th day of October, 2024.

23

24

25            ANITA A. SHENIAN, CSR No. 12325
```

# EXHIBIT C



**3:26**

< 🔵 **jimmieallen** ✔️

# jimmieallen ✔️
Instagram
388K followers · 558 posts
You follow each other on Instagram
You both follow jamesonrodgers and 2
others

**View profile**

MAY 25, 8:35 AM

Great meeting y'all today. Y'all
are funny as shit 😂

It was great meeting you😂
We're a pretty funny group of
girls we about died when you
said you guys were practicing
to be nuns. Hope we can all
hang this weekend!

How long are y'all here ?

Till Sunday!

Message...

Case 3:23-cv-00532   Document 9921   Filed 09/28/25   Page 41 of 105 PageID #: 9872

# EXHIBIT D
# REDACTED

1              UNITED STATES DISTRICT COURT
2           FOR THE MIDDLE DISTRICT OF TENNESSEE
3

4

5   JANE DOE 2,                          )
                                         )
6                Plaintiff,              )
                                         )
7      vs.                               ) No. 3:23-cv-00582
                                         )
8   JIMMIE ALLEN, AADYN'S DAD            )
    TOURING, INC., CHARLES HURD, AND     )
9   JOHN DOES 1-100,                     )
                                         )
10               Defendants.             )
    _____)
11

12

13

14        VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF
15                    KATE SEEGMILLER
16             Tuesday, September 24th, 2024
17              Rancho Cordova, California
18

19

20

21

22

23

24

    Reported by: JUSTIN R.A. MCPHAIL, CSR No. 13873
25  FILE NO.:    6924010

1      MS. FEGAN:  Good morning -- sorry.  Good

2  morning.  My name is Elizabeth Fegan for Plaintiff.

3      MR. BRASSEL:  Good morning.  My name is

4  Alandis Brassel for Defendants Jimmie Allen, and

5  Aadyn's Dad Touring, Incorporated.

6      MS. FEGAN:  And I also have Nicolette

7  Wolfrey on the record with me from Fegan Scott for

8  the Plaintiff.

9      THE VIDEOGRAPHER:  And with that, will the

10  court reporter please swear in the witness and we

11  can begin.

12

13                  KATE SEEGMILLER,

14    the Witness herein, having been first duly sworn,

15              testified as follows:

16

17                  EXAMINATION

18  BY MS. FEGAN:

19      Q   Thank you.

20          Ms. Seegmiller, my name is Elizabeth Fegan.

21  I represent ████████████, who is known as Jane Doe

22  in this lawsuit.

23          Do you know who ██████████ is?

24      A   Yes, she's my friend.

25      Q   I'm sorry?

Page 8

1    friend.

2              How do you know ███████

3       A    I started working with her about five years

4    ago and we quickly became friends and we've been

5    friends ever since.

6       Q    Where do you work?

7       A    We work now in El Dorado Hills at Mane

8    Salon.

9       Q    Is that where you met her?

10      A    No.  We met at Freedom Salon in Folsom.

11      Q    Did there -- and tell me, as you got to

12   know ██████████ tell me a little bit about her and

13   what you saw of her?

14      A    ███████ is really friendly, and she's really

15   sweet and bubbly, and she's easy to get along with.

16      Q    Is that why you became friends with her?

17           How often did you two speak?  And I would

18   like to take us back to the first couple of years

19   that you were friends with her.

20      A    Almost every day.  We worked together so at

21   least four days a week.

22      Q    And what kinds of things would you talk

23   about?  Would you just talk about work?

24      A    No.  We were friends so we talked about

25   everything.

page 10 header

1  bodyguard asked for her number to give to him.

2      Q   Did she tell you anything else?

3      A   That he was a country singer and that he

4  wanted to pursue a relationship with her it seemed

5  like.

6      Q   And after that first day when she came back

7  after meeting Jimmie Allen, did you ever have

8  occasion to see her speaking with him?

9      A   She would Facetime him at work pretty

10 often.

11     Q   And were these conversations that you could

12 overhear or see?

13     A   Yes.

14     Q   Where were you situated in the salon at

15 that time in relation to where she was?

16     A   Typically we would both be in the break

17 room and he would Facetime her, or he would Facetime

18 him.

19     Q   And during these conversations, what kinds

20 of things did overhear or see?

21     A   Like they just started dating, like they

22 were flirting and talking about seeing each other in

23 person.

24     Q   During these conversations that you could

25 hear between ███ and Jimmie Allen, were there

1  ever conversations about whether he was married or

2  not?

3      A   I don't know if I overheard that, but

4  ████████ had told me that he was married legally, but

5  he was separated.  And that was what he told her.

6      Q   Did there come a time when you learned that

7  ████████ intended to see Mr. Allen?

8      A   Yes.  She said he was going to fly her out

9  to Vegas to see him.

10     Q   Did she tell you anything else in advance

11  of that trip?

12     A   I think it was a bowling trip he was doing,

13  and that it was just going to be more like a first

14  date, kind of, you know.

15         MS. FEGAN:  All right.  I lagged out a

16  minute, so I did not hear your response.

17         Can I just ask the court reporter to tell

18  me what she said.

19                 (Record was read.)

20  BY MS. FEGAN:

21     Q   Did you have any understanding of whether

22  she intended to stay in Mr. Allen's room?

23     A   She told me that he was going to get her a

24  separate room, because they hadn't had a first date

25  in person yet.  So it was more just to see each

Case 3:23-cv-00582 Document 891 Filed 09/08/25 Page 47 of 105 PageID #: 9878

1    because she wasn't on birth control and he didn't.

2    I mean, she was traumatized by the incident.  And

3    she was just trying get through it and keep going to

4    work and it was hard.

5        Q   Did she tell you how finding the phone

6    affected her?

7        A   She felt violated by it.

8        Q   Is that what she told you?

9        A   Yes.

10       Q   You said that you -- it was a topic of

11   conversation for a long time, you know.  How long or

12   what does that mean to you?

13       A   I mean, I feel like it was all she could

14   think about for weeks.  And then it slowly, she

15   started to try to get back to her regular routine.

16   But it really affected her.

17            (A discussion was held off the record.)

18            THE VIDEOGRAPHER:  Looks like she just

19   dropped.  So I'll take us off record for a moment.

20            The time is 10:15, and we are off the

21   record.

22                     (Recess taken.)

23            THE VIDEOGRAPHER:  The time is now 10:17.

24   We are back on the video record.

25            You may proceed.

Case 3:23-cv-00582 Document 89-21 Filed 09/08/25 Page 48 of 105 PageID # 9709

1  ████  was one of the hardest worker I know.  And
2  she could really concentrate at work.
3          And then after the incident, she could
4  barely speak to her clients.  She was crying at
5  work.  She was acting unprofessionally and could
6  barely get through the day without crying and being
7  emotionally distraught after the incident.
8      Q   All right.  And to your knowledge, how did
9  she -- do you know if she did anything to deal with
10  it as far as like professionally, or did it kind of
11  trail off?  How did that -- how long did that?
12      A   No.  I know she's seen a therapist since
13  then.  I don't know if she immediately talked to
14  anyone about it.  I think she was trying to push
15  through it versus deal with it at the time.
16      Q   Thank you for that.
17          I want to ask you about, you know, when she
18  talked to you about the incident, she -- you said
19  that y'all talked about it a lot.  Did she give you
20  any particular details about that -- like about that
21  night and about the intercourse?  I know you said
22  that she told him to stop because she wasn't on
23  birth control; correct?  And she said that he didn't
24  do that.
25          Did she give you any other details about

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, the undersigned Certified Shorthand

 4    Reporter, holding a valid and current license issued by

 5    the State of California, do hereby certify:

 6              That said proceedings were taken down by me in

 7    shorthand at the time and place therein set forth and

 8    thereafter were transcribed under my direction and

 9    supervision.

10              I further certify that I am neither counsel for

11    nor related to any party to said action, nor in any way

12    interested in the outcome thereof.

13              The dismantling, unsealing, or unbinding of the

14    original transcript will render the Reporter's

15    certificate null and void.

16

17              IN WITNESS WHEREOF, I have subscribed my name

18    on this date: October 15, 2024.

19

20

21

              JUSTIN R.A. MCPHAIL, CSR No. 13873

22

23

24

25
```

# EXHIBIT E
# REDACTED



Today 8:11 PM

❤️❤️❤️. Gettin ready for ours ?

You know itttt

Delivered

iMessage

# EXHIBIT F



@usbowlingcongress Open Championships this week. I had a great time, meet... more

I love your wedding ring ❤️ i think you forgot to wear it when you saw me. Lol

Friday 7:54 PM

How are you ?

Today 3:43 PM

# EXHIBIT G



**12:57**

**JA**

**Jimmie** >

Yesss

What time your flight land

3:05

Friday 2:24 PM

You gonna come pick me upppp

Friday 3:34 PM

Omg Jimmie.

9777 S Las Vegas Blvd
Las Vegas, NV  89183
United States

South Point Hotel Casino

I'm in bowling meetin.
When u get here we gonna

iMessage

# EXHIBIT H



JA

Jimmie >

South Point Hotel Casino

I'm in bowling meetin. When u get here we gonna go to my next match. Just walk out and grab taxi

Tell them south point hotel

Taxi is easy

Kk! Just got in

Thought you said flight didn't get in til 11

Woulda had my security guard meet you

I told you I moved it cause I had a client Cancel. Do you not listen 🙃

iMessage

# EXHIBIT I
# REDACTED



There are tons of pharmacies near the hotel. Walgreens or CVS definitely have plan b.

Thank you so much nik. Fuck I'm such a mess right now I don't even have time to cry or panic I just feel sick I want to curl up in a bed and just feel safe

I'm so sorry, friend. Once you're safe at the hotel, you can call me and cry. You have all the proof to show he's a monster and you don't need to make your decision on how to handle this right now.

I just really did like him it sucks I feel sad and dumb

You're not dumb at all! He has all of America tricked into thinking he's some Christian family man when he's really a sad, loser pervert. It's okay to be sad though.

iMessage

# EXHIBIT J



# EXHIBIT K

< 👤 🎥

**+1 (615) 513-5353** >

I liked you Jimmie and I would have been really good to you and I have been. You disrespected me, lied to me and continue to not own your shit. You lost something that could have been good but you're so caught up in your stories and lies you're never going to find happiness because of the way you choose to live your life. I loved talking to you and enjoyed getting to know you but if you can't be real or transparent with people you will keep chasing women and looking for your next ego boost until you deal with

📷 Ⓐ | iMessage | ᵐ

# EXHIBIT L
# REDACTED

1                UNITED STATES DISTRICT COURT

2             FOR THE MIDDLE DISTRICT OF TENNESSEE

3                          - - -

4    JANE DOE 2,                    )
                                    )  Case No.:
5              Plaintiff,           )  3:23-cv-00582
                                    )
6          vs.                      )
                                    )
7    JIMMIE ALLEN, AADYNS DAD       )
     TOURING, INC., CHARLES HURD,   )
8    and JOHN DOES 1-100,           )
                                    )
9              Defendants.          )
     ------------------------------)

10

11

12

13

14         CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

15      REMOTE VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION

16               OF STEPHANIE J. CHRISTL

17                  FOLSOM, CALIFORNIA

18                  OCTOBER 21, 2024

19

20

21

22

            ATKINSON-BAKER, A VERITEXT COMPANY

23      (800) 288-3376

24      REPORTED BY:  LINDA L. HUDDLESTON, CSR NO. 11160

25      FILE NO: 6959877

1

2          MR. BRASSEL:  Alandis Brassel.  I represent

3    Jimmie Allen and Aadyns Dad Touring, Incorporated.

4          THE VIDEOGRAPHER:  Will the court reporter

5    please swear in the witness and then Counsel may

6    proceed.

7

8                        EXAMINATION

9    BY MS. FEGAN:

10         Q.  Good morning, Ms. Christl.  I introduced

11   myself before.  My name is Beth Fegan.  I represent

12   the plaintiff in this matter.

13             Can you please state your full name for

14   the jury.

15         A.  My name is Stephanie J. Christl.

16         Q.  And, Ms. Christl, where do you -- where

17   are you currently employed?

18         A.  In Folsom, California.  And I have a

19   private practice, Christl Coaching and Trauma.

20         Q.  The name of your practice is Christl

21   Coaching and Trauma?

22         A.  Yes.

23         Q.  As we go through today, I won't promise

24   to get any kind of medical or wellness terms

25   correct, so if I don't have 'em correct, please

```
 1        A.  Is it okay, sir?  All right.  I --
 2   I believe it was September --
 3        MR. BRASSEL:  It's fine with me.
 4        THE WITNESS:  Okay.  Thank you.
 5          -- September 15th.  Hang on.  This is all
 6   over my -- September 15th.
 7        Q.  BY MS. FEGAN:  Of 2022?
 8        A.  Yes.
 9        Q.  And why did [REDACTED] come to see you?
10        A.  So struggling in her relationships, has
11   anxiety, couldn't sleep, didn't feel like herself,
12   her whole world had fallen apart and was struggling
13   in life.
14        Q.  Did she explain or understand the cause of
15   her symptoms?
16        A.  Yes.
17        Q.  Can you share with us what she told you?
18        A.  She told me that she had -- just the story
19   with meeting and what happened to her in Las Vegas
20   with somebody she thought that was her friend,
21   Jimmie Allen, and what she went through meeting
22   there.
23          And, you know, I stress that, you know,
24   she -- she's so shut down, it was very slow to get
25   some of that out of her.  So, you know, it wasn't
```

1    her?

2         A.  Yes.

3         Q.  And also, this reflects your charges.  Do

4    you -- how much do you charge per hour?

5         A.  It's 150 an hour.  Some of these, I wasn't

6    paid for.  She -- I just didn't pursue it, because

7    she was struggling, didn't have, you know, a lot of

8    money.

9              So I'd have to go through on which ones

10   were actually paid.

11        Q.  Okay.  But your standard hourly rate is

12   $150 per hour?

13        A.  Um-hmm.  And --

14        Q.  "Yes"?

15        A.  -- my sessions are usual an hour -- hour

16   and a half.  They -- usually not, you know, shorter

17   than that.

18        Q.  Okay.

19             When I asked you if $150 is your standard

20   amount, you said "um-hmm," but we have to say "Yes"

21   or "No" for the record.

22        A.  Oh, I apologize.  Yes.

23        Q.  Okay.

24             And when you said that your standard time

25   is one-and-a-half hours, would that then be a $225

```
 1    charge for a one-and-a-half-hour session?
 2         A.  Yes.
 3         Q.  Okay.
 4             And based on your meetings with -- with
 5    ████████████ -- or let me say this:  What was your
 6    role in ████████████ treatment?
 7         A.  Overall, it was try to get her back to who
 8    she was before these traumas piled up.
 9         Q.  And when you say "these traumas piled up,"
10    what are you referring to?
11         Life has a way of giving us things that hit
12    and -- out of our control, those traumas that
13    affect us, and it changes us.  We have to become a
14    certain way in order to survive.
15             And so the big one, of course, was when
16    she was in Las Vegas.  But, you know, there's also
17    underlying layered traumas with people too.
18             My goal is -- my goal for everyone is to
19    try to get them back to living a very fulfilled,
20    present life, able to, you know, exist in life by
21    processing these, you know, traumas out of their
22    brain and body and to get back to who they -- they
23    were.
24         Q.  What methods did you use to assess
25    ████████████ symptoms?
```

 1    friends.  Sat -- sat down, I think, on a bench or a

 2    pole, and just cried; didn't know where to go.  I

 3    don't think she had a lot of money or anything when

 4    she left the room.

 5             Didn't have a hotel room.  Yeah, didn't

 6    have -- just had her suitcase, as -- as far as I

 7    recall.  Very upset.  Very upset, I guess.

 8         Q.  And when she presented to you then in

 9    September, did she -- was this event still having

10    an effect on her emotional state?

11         A.  Yeah.  It was still having an effect on

12    her emotional state.  With █████ she is more of

13    a -- we have fight/flight, and then we have

14    freeze/numb.  And if we go back to even the

15    balcony, you know, when somebody -- immediately we

16    want to go into flight.  You can't for -- or yes,

17    people will argue yes, you can; you can walk out of

18    there.

19             Fight/flight, if you go through

20    those things, then you're gonna go to your

21    free/numb -- freeze/numb state, and just try to

22    make this thing, you know, pass.  Go through with

23    it.

24             And due to █████ and her personality of

25    always struggled with, you know, this -- as I found

```
1    out more of the shutdown due to some things in her
2    past, that freeze/numb, when she left, she was more
3    in fight/flight.
4            When I met with her, she's very blocked,
5    very disconnected, disassociated, even kind of
6    she -- sitting with her, it takes a lot to get that
7    to come up.
8            So as far as going back to your
9    question -- forgive me -- I think I went off.
10   Yeah, she was affected by it --
11        Q.   Okay.
12        A.   -- still, but...
13        Q.   And to help the jury understand a little
14   bit, you talk about -- not with respect to -- to
15   ███████████  in particular, but generally,
16   fight/flight, freeze/numb, are these responses that
17   you typically see when you're working with your
18   trauma clients?
19        A.   Yes.
20        Q.   And do you see all of them in everyone or,
21   you know --
22        A.   Yeah.  No, that's okay.
23            You're going to see a little.  And even in
24   ourselves, as we start to understand, you will see
25   we do it ourself.  But it can -- you know, you kind
```

1    It is just in the body.  Sometimes you work with
2    what's happening right now in your life.  You come
3    in, you're having a problem with your relationship,
4    bring that up, and a lot of times it will go to
5    that incident or another, you know, trauma
6    incident.  It goes to that incident.
7           Being unable to be intimate because
8    certain positions set somebody -- her -- her off in
9    ways you can imagine.  So, um-hmm.
10        Q.  Okay.
11           How has the trauma associated with the
12    event in Las Vegas affected ███████████ personal
13    relationships?
14        A.  She's having -- she was having struggles
15    with her boyfriend.  She has a great resource group
16    with her friends.  I think that stayed pretty
17    solid.  But being able to connect to him, function.
18    You know, just going from these really low moods to
19    some even anger and anxiety and outbursts that
20    don't make sense.  I think that she would admit
21    that she's, you know, been more -- partied more,
22    drank more, which is very common.  So that was very
23    concerning seeing what was happening with her and
24    her boyfriend.
25           And also, I think the biggest concern

1    should not have -- "I shouldn't have come here.  I
2    deserved it.  I feel like I deserve it."
3    That's -- I shouldn't -- "I should not have done
4    that.  I should have known better."
5           And that's -- that what you hear all
6    the time from clients, is "I should have known
7    better, I deserve it."  And that's -- that's kind
8    of -- that's a really heartbreaking thing, but you
9    hear that a lot.
10        Q.  Okay.  In your opinion, did ██████████
11   make progress during the course of your treatment
12   or has she made progress?
13        A.  I think she was making some.  I think it
14   was slow.  I think things like having, you know,
15   problems in her relationship, money struggles and
16   having a child, you know, it's probably set her
17   back from what I saw when I saw her.  I think it
18   just kind of like started to move and just stayed
19   right there, from anything that we did.
20        Q.  At some point, was there a break in -- in
21   your treatment that she didn't -- she wasn't coming
22   back to you?
23        A.  Yes.  From -- oh, that one paper that
24   I -- you have, was it -- gosh, yeah.  It was -- I
25   have that right here.  Do you have that, that

1    exhibit?
2         Q.  Yes, I can pull it up here.
3         A.  That would tell us exactly.
4             And then, you know, I've heard, I -- you
5    know, sent me a text when she had her baby, and I
6    saw a picture.  It's was interesting, though, one
7    thing I noticed -- yeah, you see from January
8    22nd -- did I say -- did I do a typo there?  It was
9    January 22nd.  I was -- yeah, 23rd.  And then I saw
10   October, so almost -- oh, almost a year later.
11        Q.  Okay.
12        A.  I saw a picture she sent me, but what
13   caught -- caught my heart was she was
14   holding -- probably it doesn't really mean
15   anything, but I'm a very aware person, and I -- I
16   think what a beautiful little family.  But I
17   noticed that her husband was holding the baby, she
18   was kind of -- you know, body language tells us a
19   lot, little separated, holding -- holding her dog.
20            And it just -- just caught my eye.  I
21   don't know that means anything.
22            And that --
23        Q.  Oh, sorry.  Go ahead.
24        A.  No, I'm sorry.
25        Q.  I was gonna say, do you recommend that she

1    engage in additional treatment with you?
2         A.  Oh, yeah.  I really do, whether it's with
3    me.  But she honestly, yes, yes.
4           You know, we -- we've got -- we've got
5    kids now, that when they're -- when they're not
6    raised with that kind of connectedness and
7    closeness, you know, whether it's a parent is
8    gone -- or, you know, I see this a lot, alcohol
9    addiction, a parent that can't attach, that's where
10   kids feel their safety.
11          And I think there was -- there was
12   attachment stuff with her when she was young, which
13   led to becoming this -- this way.
14          So yes, for her sake, and also for this
15   little -- this child too, that needs to feel that
16   their very biological, you know, parative to attach
17   to a parent.  So I really do believe she does.
18          And like I said, with me or anybody else,
19   I really would like her to continue.
20        Q.  You mentioned attachment issues from when
21   she was young.  Did those affect the way that she
22   interacted with Mr. Allen, from your
23   understanding?
24        A.  Yes.  I would say when you learn to please
25   or keep people happy, not rock the boat, when you

1    (indicating); or some people just stay in the --
2    more disassociation.  And we learn to become that
3    way for survival.
4         She really struggles with sleeping.
5    Always has, but it's worse now.  Doesn't dream.  A
6    lot of clients will dream.  Doesn't dream.  Does a
7    lot of that dispersonalization.  You know, almost
8    at times, she's looking at life from the outside.
9         Q.  BY MS. FEGAN:  And would you -- what are
10   your recommendations to her in terms of ongoing
11   sessions needed with you or -- or ongoing sessions
12   that she should pursue?
13        A.  Yeah.  She just needs a lot of -- working
14   with disassociated clients, takes a lot of
15   resourcing, a lot of teaching it's okay to be in
16   the body.  A lot of checking in, right, with, you
17   know, "Can you feel your feet?  Do you know where
18   you are right now?"
19        When you can see that vacant stare looking
20   through you, catching that and, you know,
21   resourcing.
22        Probably body work would good, if she can
23   be touched by a safe, trained body worker.  Because
24   touch is probably one of the strongest; next to
25   smell, is one of the fastest most powerful that can

1    happen.

2              Definitely, ongoing trauma work.  You

3    know, any of these kind of things that can, you

4    know, make somebody feel very resourced and calm

5    that nervous system.  A disregulated nervous system

6    doesn't have to be up here (indicating), it could

7    be down low.  That's a disregulation.  We're meant

8    to kind of move like this (indicating) in life.

9              I showed you a -- I believe I showed you a

10   graph that shows what happens without discharging

11   trauma.  Should I show you that or --

12        Q.   Yeah, yeah.

13        A.   I -- I had -- it's pretty simple.  I think

14   it's Peter Levine's work.

15             That's middle line, that's where we want

16   to be right there (indicating), that nice flow

17   that's working there.  When somebody has suffered

18   traumas -- you know, this is where we want to be

19   (indicating).  Good days, bad days, we have parents

20   that helped us, didn't abandon us, Dad's still

21   home.  You know, those things; okay?

22             But this is what starts to happen with

23   trauma.  It starts to go above and below baseline

24   (indicating).

25             So we can have a lot of these and maybe

1    we're going to be just fine.  At some point, we get

2    stuck, in a stuck-on or a stuck-off.  And these are

3    the symptoms, generally speaking, that occur.

4            And so you see down below, she's doing a

5    lot of these (indicating); okay?  And then every

6    now and then, you're going to see this

7    (indicating), because you can't -- that emotional

8    flooding, that hostility, that rage when something

9    sets you off, that'll happen.

10           But when we can work on it, we can

11   discharge -- discharge that pent-up -- those

12   traumas that are inside, and then, you know, those

13   symptoms, generally they will come down.  And it

14   does work.  It does work.

15           And -- but she's -- she needs work.  I

16   hope she will do it.

17       Q.  In your experience with persons in similar

18   situations as -- or with similar trauma responses

19   as ██████████, do you normally recommend that

20   they -- they come to you once a week?

21       A.  Yeah, we do once a week.

22           Though, I've also done intensive with

23   colleagues where it's spending two or three hours

24   with me, and then they're going into kind of a

25   medi- -- maybe you'll go into some mindfulness

```
 1    work, maybe sent to body work, and then just some
 2    coping kills.
 3            So I may see -- you know, when -- when I
 4    worked at Pacific Counseling and Trauma Center for
 5    a number of years, and we are a nonprofit, and then
 6    we had a trauma -- you know, a profit side.  And so
 7    we would do intensives a lot there, 'cause we had
 8    so many therapists.  And sometimes we'd do
 9    week-long, two weeks.  Sometimes it was animal
10    therapy, ride horses.
11            I'm in my own practice now with two
12    other colleagues in the office.  I've done some
13    simple ones with a couple of clients.  So, you
14    know, that -- but it's so hard.  There's finances
15    and time off from work.  And -- and I tell you,
16    it's hard work.  It's hard work.  Important work.
17        Q.  And in your experience, you know, does
18    this take years to recover from?  What is the
19    typical timeline, if there is a typical timeline,
20    for recovery when the work's being done?
21        A.  Well, that's a hard one.  It really is, as
22    you can probably imagine, I know when you ask me
23    that question.
24            A constant work, and with ████████ having a
25    pretty good resource group of friends that I don't
```

1  see very often, I -- I -- once a week for sure.

2  And I do see people with some very extreme cases

3  once a week, if they can afford it.

4          And, okay, if money wasn't an issue for

5  somebody and I work around it, I'd say twice a week

6  for a couple months, and then going to once a week.

7  As they progress, every other week.  And then

8  sometimes people come back for what they call

9  "tune-ups" when something bothers them, you know.

10          Q.  Okay.

11          A.  And there -- there are trauma retreats

12  and things.  We're getting so much better at

13  having -- having that for people and understanding

14  trauma deep down and layers of it.

15          So I -- I don't do those, though.

16          Q.  Let's see.  I'm almost done here.

17          A.  Okay.

18          Q.  Are -- to the best of your knowledge, is

19  the information contained in this report contain

20  all of your opinions regarding what you observed

21  about ██████, or ████████, and the impact on

22  her?

23          A.  In the report and what I've written, yeah.

24          On my opinions -- could you ask me what

25  you're really -- what you're asking me, so I answer

1    break, and we'll be back.

2            Okay.  Thank you.

3        THE WITNESS:  Thank you.

4        THE VIDEOGRAPHER:  Going off the record at

5    11:29.  This ends Media Unit 1.

6            (Recess taken.)

7        THE VIDEOGRAPHER:  We are back on the record

8    at 11:32.  This is begins Media Unit 2.

9

10                      EXAMINATION

11   BY MR. BRASSEL:

12       Q.  All right.  Thanks again for your time

13   today.  I don't have too many questions, just want

14   to clarify some things that were, you know -- that

15   were discussed earlier.

16           The first one is just how -- excuse

17   me -- how did the plaintiff find you?  Do you know,

18   like, who referred you to her?

19       A.  I do.  It was one of her friends that had

20   seen me before for some of her issues.

21       Q.  Okay.

22       A.  One of her close friends.

23       Q.  Do you -- okay.

24           And I noticed that on Exhibit 4, which was

25   the schedule --

1          A.  Yeah.

2          Q.  -- of treatment, there were some

3    parentheses that said "couple."

4          A.  Yeah, that's when her boyfriend came in.

5          Q.  Okay.  So -- and was -- was that to

6    specifically treat this -- this issue as well --

7          A.  It's the --

8          Q.  -- or to address this issue?

9          A.  I think I understand what you're saying.

10   It was to treat the symptoms of that issue that was

11   showing up in their relationship --

12         Q.  Okay.

13         A.  -- the struggles they were having.

14         Q.  Okay.  All right.  Thank you.

15         A.  You're welcome.

16         Q.  At one point, you said that -- just

17   something to the effect one of your -- one of your

18   goals earlier was to get her back to who she was

19   before traumas piled up?

20         A.  Yeah.

21         Q.  Okay.

22         A.  That's a Mission Statement, I suppose,

23   with all my clients.  They think I'm going to

24   change them, and I try to be encouraging that,

25   look, the way you are right now and the things

1              REPORTER'S CERTIFICATE

2

3        I, LINDA L. HUDDLESTON, CSR NO. 11160,

4    Certified Shorthand Reporter, certify;

5        That the foregoing proceedings were taken

6    before me at the time and place therein set forth,

7    at which time the witness was put under oath by me;

8        That the testimony of the witness, the

9    questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13       That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15       I further certify that I am not a relative or

16   employee of any attorney of the parties, nor

17   financially interested in the action.

18       I declare under penalty of perjury under the

19   laws of the State of California that the foregoing

20   is true and correct.

21       Reading and signing was requested.

22   Dated this : *Linda L. Huddleston*

23

24   _____

25            LINDA L. HUDDLESTON, CSR NO. 11160

# EXHIBIT M
# REDACTED

# Christl Coaching and Trauma, Inc

1000 River Rock Dr.

Suite 106

Folsom, CA 95630

(September 21, 2024

RE: █████████

Please find the requested statement:   (Charges are 150.00 per hour )

September 15, 2022  2.0 hrs

September 20, 2022 1.5

September 26, 2022 1.5

October 25, 2022  1.5

October 26, 2022 2.0 (couple)

November 1, 2022 1.5

November 15, 2022 1.5

November 16, 2022 1.5

November 30, 2022 1.5

January 12, 2022 1.5

January 18, 2023 1.5

January 23, 2023 1.5

January 24,2023 2.0 (couple)

October 14, 2024 2.0

Stephanie Christl  NBC-HWC  A-3180531

# EXHIBIT N
# REDACTED

# Stephanie Christl  NBC-HWC

██████████ presented to my office on September 15, 2022 suffering signs and symptoms of Post-traumatic Stress Disorder (PTSD), due to an incident in which she reported to the police and obtained legal counsel.

Because of the circumstances of the incident, (a threat to her moral integrity and dignity, by a well-recognized figure in the entertainment world) and her past trauma events, as well as reporting the incident and the stress of the subsequent legal procedures ████ presented with the following:

1. Having intense emotional response (s) of fear, helplessness, rag, shame, and humiliation.
2. Experiencing intrusive, distressing thoughts or images that recall the traumatic event and its associated intense emotional response.
3. Experiencing intense distrust in interpersonal relationships, which has threatened her relationships and connection.
4. Experiencing physiological reactivity associated with fear and anger, shame and humiliation when she is exposed to the internal or external cues that symbolize the traumatic event. The radio, social media, pregnancy, physical touch (intimacy) etc. As well as having to deal with, the court, media, attorneys, depositions etc.
5. Experiencing a pattern of irritability that was not present before the traumatic event occurred, (noticed not only by ████, but also by family and friends).
6. Experiencing intrusive, distressing thoughts or images that recall the traumatic event and its associated intense emotional response.
7. Experiencing intense distress when hearing the perpetrators voice on the radio or other media outlets.
8. Avoidance of thinking, feeling, or talking about the traumatic event because of the associated negative emotional responses.

Confidential
Confidential

DOE20000005
DOE20000067

9. Avoidance of activity, places, or people associated with the traumatic event because she is fearful of the negative emotions that may be triggered.

10. Having developed a lack of interest and a pattern of lack of participation in activities that had previously been rewarding and pleasurable.

11. Experiencing sad affect, lack of energy, social withdrawal, and guilt/shame feelings as part of a depressive reaction.

12. Experiencing moments of intense anxiety as well as a shutdown/numb dissociated states

Assessing nature of PTSD syndrome, interventions and treatment plans implemented:

1. ██████ was asked about the frequency, intensity, duration and history of her PTSD symptoms, fear, and avoidance. The Anxiety Disorder's Interview Schedule for DSM_IV (DiNardo, Brown, and Barlow) and PTSD Resource Packet (Jennifer Wolkin, PhD/BrainCurves 2016) were used to assess the client's PTSD symptoms. The assessment of the client's PTSD symptoms indicated that her symptoms interfere with her life, especially in her interpersonal relationships notably with her boyfriend/father of her baby.

2. Extensive interviewing was administered to ██████ to assess for the presence and strength of the PTSD symptoms and confirmed the presence of PTSD symptoms.

3. Specific stimuli that may precipitate the client's fear and avoidance were reviewed.

4. Specific thoughts were revised as to how they contribute to the client's fear and avoidance.

5. Specific situations that have precipitated the client's fears and avoidance were reviewed.

6. The client was gently encouraged to tell the entire story of the traumatic event, within tolerance level.

7. The client was given the opportunity to share what she recalls about the traumatic event, especially its impact on her relationships.

8. Sequence of events was explored before, during, and after the traumatic event.

Confidential
Confidential

DOE20000006
DOE20000068

9. A discussion was held about how PTSD results from exposure to trauma and results in intrusive recollections, unwarranted fears, anxiety, and a vulnerability to other negative emotions, which were impacting her relationships.

10. Specific examples of how PTSD symptoms occur and affect individuals.

11. The client was taught about techniques that will help to build confidence, desensitize, and overcome fears, and see oneself, others, and the world in a less fearful and depressing manner. This was worked on in a couple's setting as well.

12. The client was encouraged to continue her exercise routine at her gym as a means of coping with stress and developing an improved sense of well-being.

13. The client was given stress relief/relaxation BiLateral music during session to help calm her nervous system as well as encouraged to continue doing so at home.

14. Brainspotting (BSP) specific for trauma, was used to reduce her emotional reactivity to the event, as well as a tool to help her process through the event.

█████ has shown progress with her treatment and is compliant in all that is asked of her and fully active in her treatment. She wishes nothing more than to gain back her feeling of safety and trust so that she can thrive in her personal relationships and daily life. It is recommended that █████ continue with care because of the uniqueness of her case and because of the effect the incident has had on her relationships. Getting pregnant and having a baby has also brought up memories of the event as well as unexpected emotions.

Confidential
Confidential

DOE20000007
DOE20000069

# EXHIBIT O

## *Jane Doe and John Doe v. Kevin Moncla; 2006 Jury Verdicts LEXIS 44059*

2004-CA-000374

March 06, 2006

**Headline:** Voyeur Videotaped Couple With Hidden Camera at Guest Cottage

**Published Date:** July 02, 2006

**Topic:** Intentional Torts - Unreasonable Intrusion into Seclusion

**Injury:** Emotional Distress

**Practice Area:** Torts

**State:** Florida

**Court:** Okaloosa County County Court

**Plaintiff Counsel**

Plaintiff Name: (John and Jane Doe)

Virginia Buchanan

Firm Name: Levin Papantonio Thomas Mitchell Echsner & Proctor PA

Address: Pensacola, FL

**Defendant Counsel**

Defendant Name: (Kevin Moncla)

Not Represented

**Judge:** Robert Barron

**Case Summary**

From October 2002 through February 2003, the plaintiffs, a married couple in their 20s (names not disclosed), stayed in the Okaloosa guest cottage of Kevin Moncla. The female plaintiff and Moncla's wife were friends. In August 2003 after the plaintiffs moved out, Moncla's wife found a ***video*** recorder under the cottage bed which contained numerous images of voyeurism. Police told the the plaintiffs about the tapes in July. Moncla was arrested and pleaded guilty to a violation of Florida's voyeurism statutes.

The plaintiffs sued Moncla for capturing their images ***without*** their knowledge or ***consent***.

The plaintiffs claimed that ***without*** their permission Moncla placed a camera in the bathroom vent and captured the plaintiffs in various stages of undress, and other ***intimate*** and private moments.

The detective testified that Moncla had over 47,000 pornographic and voyeured images on his seized computer. The detective also identified the plaintiffs' images as among those contained in Moncla's computer.

Plaintiff's counsel also introduced the records of the criminal investigation at trial. These records detailed how Moncla's home had extra wiring to accommodate the use of ***video*** cameras.

Blanchard also pointed to the cameras and recording equipment seized from Moncla's home by the police.

Moncla did not appear at trial.

**Injury Text:**

The female plaintiff claimed that she suffered severe emotional distress. She has a fear of public places and restrooms. She suffers from depression and panic attacks. She now works for a family-owned business because she believes it is a safer environment. Her husband also claimed severe emotional distress. He is frequently filled with anger since the incident. He has been reticent to use public facilities. They sought an unspecified amount for punitive damages.

**Trial Length**

1.0 day

**Jury Deliberation**

2.0 hours

**Jury Composition**

5 male, 1 female

**Jury Poll**

6-0

| PLAINTIFF NAME | PROPERTY AWARD |
|---|---|
| John and Jane Doe | $ 3,250,000 |

**Plaintiff Amounts:**

(John and Jane Doe)

$500,000 Personal Injury: past mental anguish

$750,000 Personal Injury: future mental anguish

$2,000,000 Personal Injury: punitive damages

**Award:** $ 3,250,000

**Award Details:** The jury awarded $3.25 million. Plaintiffs' attorney Virginia Buchanan lauded the bravery of her clients for coming forward and hoped that this lawsuit will deter other voyeurs. Blanchard believes that the verdict is important as it warns other people that Moncla may come in contact with of his actions.



www.verdictsearch.com/index.jsp

Copyright 2006 ALM Media Properties, LLC.
 All Rights Reserved
 Further duplication *without* permission is prohibited
VerdictSearch
Weekly

# EXHIBIT P

## *JoAn Couche v. John Coons; 2002 Jury Verdicts LEXIS 55522*

CV799596

December 23, 2002

**Headline:** Sex, Lies and Videotape: Ex-wife Brings Charges to Trial

**Published Date:** February 27, 2003

**Topic:** Privacy - Invasion of Privacy - Intentional Torts - Assault and Battery

**Injury:** Post-traumatic Stress Disorder, Psychological, Depression

**Practice Area:** Civil Procedure; Civil Rights Law; Criminal Law and Procedure; Evidence

**State:** California

**Court:** Superior Court of Santa Clara County, San Jose

**Plaintiff Counsel**

Plaintiff Name: (JoAn Couche, JoAn Couche)

Joseph H. Ainley

Firm Name: Popelka Allard

Address: Columbus, OH

**Defendant Counsel**

Defendant Name: (John Coons)

James W. Kellenberger

Firm Name: Law Office of James W. Kellenberger

Address: Santa Clara, CA

**Judge:** Gregory H. Ward

**Case Summary**

The plaintiff and the defendant married in May 1997, separated in May 2000, and divorced in December 2000. During the course of the marriage, the plaintiff, 52, a former vice-president of marketing, claimed that the defendant repeatedly abused her by grabbing her, pushing her, throwing her to the ground, choking her and threatening to kill her.

Detective Sgt. Nancy Csabanyi, who had responded to a domestic disturbance call at the marital residence on three separate occasions in 2000, testified that the plaintiff had old and fresh bruises on her arms and had marks on her neck consistent with choking. Officer Csabanyi described the marks and bruising on the plaintiff's arms as being consistent with spousal abuse. The plaintiff's son from a prior marriage testified that he had observed the defendant choking or strangling the plaintiff. The plaintiff testified that she was never free of bruises while she was married to the defendant and that she had sought medical treatment on two occasions for injuries he had inflicted.

The plaintiff further claimed that in April 2000, she discovered that the defendant had wiretapped the family telephone. A few months later in July 2000, she discovered videotapes of the defendant reportedly engaged in sex with other women. The plaintiff claimed these tapes were made by the defendant using hidden video cameras

without the consent of the women he was having sex with. The plaintiff believed that she had been videotaped having sex with the defendant as well, although she admitted she did not have direct evidence. Also according to the plaintiff, a tape recorder was hidden in the living room of the marital home and secret recordings of marital communications were made.

The plaintiff sued claiming violation of privacy, assault and battery, and violation of Penal Code § 632 by making secret and illegal video and audio recordings of the plaintiff.

The defendant admitted making audiotape recordings of the plaintiff but argued that they were trivial. He denied ever having videotaped the plaintiff, noting the absence of such a videotape, and stating that he had only videotaped himself having sex with one woman on one occasion prior to his relationship with the plaintiff.

The defendant denied he ever tried to strangle the plaintiff and contended that he had gently pushed her on several occasions, but had never grabbed or thrown her. He noted that the plaintiff did not report any alleged injuries until she and the defendant had separated.

**Injury Text:**

The plaintiff said that she suffered severe and lasting emotional distress as a result of being audiotaped, videotaped, and physically abused during the marriage.

She claimed to suffer from depression, anxiety and symptoms consistent with post-traumatic stress disorder, all requiring psychiatric counseling. She incurred approximately $5,800 in past medical expenses.

Compensatory and punitive damages were sought against the defendant.

The defendant maintained that the plaintiff's injuries were trivial and de minimus, her special damages nominal, and that the jury should award nothing more than nominal damages if it found for the plaintiff.

**Trial Length**

5.0 days

**Jury Deliberation**

1.0 day

**Jury Poll**

11-1 liability; 12-0 malice; 12-0 oppression; 3-9 fraud

**Post Trial Status**

The defendant filed motions for a new trial and to tax costs. The plaintiff indicated that opposition papers will be filed.

| PLAINTIFF NAME | PROPERTY AWARD |
|---|---|
| JoAn Couche | $ 215,000 |

**Plaintiff Amounts:**

(JoAn Couche)

$15,000 Personal Injury: Punitive Exemplary Damages

$200,000 Personal Injury: Compensatory Damages

**Plaintiff Expert(s)**

JoAn Couche v. John Coons; 2002 Jury Verdicts LEXIS 55522

David Klausner

Address: Redwood City, CA

Specialty: Software

Affiliation: Joseph Ainley

David Waggoner, M.D.

Address: San Jose, CA

Specialty: General Practice

Affiliation: treatingdid not testify, Joseph Ainley

Margaret Cochran

Address: San Jose, CA

Specialty: Psychology/Counseling

Affiliation: licensed mental health care specialisttreatingdid not testify, Joseph Ainley

Mark H. Strassberg, M.D.

Address: San Francisco, CA

Specialty: Neuropsychiatry

Affiliation: did not testify, Joseph Ainley

**Award:** $ 215,000

**Award Details:** Following a 1-day deliberation on liability and 1 1/2 hours deliberation on punitive damages, the jury awarded $215,000 total to the plaintiff. The jury found against the defendant on liability, malice and oppression, and for the defendant on fraud.

A prior arbitration, held Aug. 23, 2002, resulted in an arbitration award of $7,500 that the plaintiff rejected.



www.verdictsearch.com/index.jsp

Copyright 2003 ALM Media Properties, LLC.
 All Rights Reserved
 Further duplication without permission is prohibited
VerdictSearch
California JVW Vol. 2

**End of Document**

# EXHIBIT Q

# *Doe, John and Jane v. Kaiser, Patrick; 2007 Jury Verdicts LEXIS 117998*

06-cv-1045

**Title:** CIVIL RIGHTS

**Published:** December 16, 2007

**Result:** $ 266,712 VERDICT - Privacy Rights - Defendant installed unauthorized electronic surveillance equipment in the married plaintiff's apartment (which the defendant owned) - Recorded plaintiff's visual images and conversations occurring within the residence, including private and intimate moments - Plaintiff's claimed this caused them mental anguish and emotional distress.

**Award:** 266712

**Injury:** Damages, Privacy rights

**Practice Area:** Civil Procedure; Criminal Law and Procedure; Torts

**State:** New York

**Court:** United States District Court for the Northern District of NY

**Judge:** US Magistrate Judge David Peebles

## Case Summary

The defendant owned the apartment building that the plaintiffs were residing in prior to October 2003. The plaintiff's had a close relationship with the defendant, began to utilize his services as an electrician in their home and recommended him for work in the homes of other friends and family members. During the period of August, 2003 through October, 2003, the defendant utilized an unauthorized micro-cam video camera and transmission and recording system that he had installed in the plaintiff's bedroom closet doorway to intercept and record the plaintiff's visual images and conversations, including some of their most private and intimate moments. The plaintiffs were unaware of the surveillance by the defendant until about three years later they learned of his activity. The plaintiff John Doe was a police officer and was on-duty at the time a complaint was registered against the defendant by another victim. The investigation revealed that the defendant had in fact installed video recording equipment in the plaintiff's apartment and had in his possession twelve surveillance videotapes of various tenants at intimate and private moments, including two cassette tapes of the plaintiffs. It was also determined that there were eight victims, all residents of the apartment building that was owned by the defendant. The defendant was indicted and found guilty in connection with the unlawful surveillance. The plaintiffs claimed that although their identities were never publicly disclosed, numerous friends and relatives had inquired as to whether they were a victim of the defendant. This embarrassment was also exacerbated by the fact that John Doe's colleagues in the police department had conducted the investigation into the matter. Plaintiff Jane Doe has sought counseling from three separate sources and was described as suffering from post traumatic stress disorder. They also testified that the incident has had a negative effect on the couple's relationship. The judge ruled that the defendant has caused the plaintiff's considerable embarrassment, humiliation and anguish. He awarded the plaintiff John Doe $ 50,000 compensatory damages for mental anguish and emotional distress and punitive damages in the amount of $ 25,000. Plaintiff Jane Doe was awarded $ 150,000 in compensatory damages and $ 25,000 punitive damages. Additionally, the plaintiffs were awarded $ 462.00 out-of-pocket losses and $ 16,250.67 in attorney's fees.

**Reference:** Doe, John and Jane v. Kaiser, Patrick. Index no. 06-cv-1045; Judge US Magistrate Judge David Peebles, 7-10-07. Attorney for plaintiff John and Jane Doe: Edward Z. Menkin, Esq. of Menkin Law Firm in Syracuse, NY. Attorney for defendant Patrick Kaiser: Salvatore J. Piemonte, Esq. of Piemonte Law Firm in Syracuse, NY.

Doe, John and Jane v. Kaiser, Patrick; 2007 Jury Verdicts LEXIS 117998

**Published in:** Volume 24, Issue 7

Copyright 2007 Jury Verdict Review Publications, Inc.
Jury Verdict Review & Analysis

**End of Document**

# EXHIBIT R

# HEATHER BRADBURY V. ALAN KENDRICK; 2005 MD Metro Verdicts Monthly LEXIS 655

23 C 02 000089

January 2005

**Topic:** Premises Liability Privacy - Videotaping Guest In Shower - Punitive Damages Privacy punitive Damages

**Result:** $ 301,275. (verdict)

Breakdown: $ 101,275 in compensatory damages and $ 200,000 in punitive damages.

**Award:** 301275

**Injury:** Post-traumatic stress disorder (PTSD) requiring psychological counseling. Plaintiff claimed $ 1,275 in past medical expenses and no lost wages.

**Practice Area:** Civil Procedure; Criminal Law and Procedure; Evidence; Torts

**State:** Maryland

**County:** Worcester County, MD

**Court:** Circuit Court

**Judge:** Thomas C. Groton

**Plaintiff Profile**

Age: 27
_**Sex**_: Female

Occupation: Nurse

Marital Status: Married

**Plaintiff Counsel**

Douglas E. Fierberg, Washington; Peter A. Holland, Annapolis;

**Defendant Counsel**

Ernest I. Cornbrooks III, Salisbury; Cynthia Brubaker MacDonald, Salisbury;

**Case Summary**

A woman was videotaped _**without**_ her _**consent**_ while showering at the home of a family friend. The woman claimed the _**video**_ was an invasion of her privacy and that the host was negligent in failing to provide a safe premises. The host contested liability and also disputed the alleged damages asserted by plaintiff. A Worcester County jury awarded the woman $ 301,275, which included $ 200,000 in punitive damages.

Plaintiff Heather Bradbury and her husband were visiting the home of Defendant Alan Kendrick. Unknown to plaintiff, defendant had arranged a _**video**_ camera to record her while she was in the shower. The videotape was discovered by another party and turned over to the police. Defendant pled guilty in a criminal court for violations of the Maryland _**Video**_ Surveillance Statute.

Plaintiff alleged that defendant violated her privacy and created an unsafe environment by placing the hidden camera in her bathing area. She claimed that he was negligent in failing to provide a safe premises for his guests.

Defendant admitted that he videotaped plaintiff **_without_** her **_consent_**, but still contested liabilityand also claimed that plaintiff suffered no tangible damages.

**Plaintiff Expert(s)**

Ellen G. McDaniel, M.D. - Forensic Psychiatrist Columbia, MD

Katherine Wingate, L.S.W. - Social Worker Annapolis, MD

**Insurance:** Allstate

**Jury Deliberations:** 2 hours

**Published in:** Volume 17, No. 6

Copyright 2005 JAS Publications
METRO VERDICTS MONTHLY

**End of Document**

# EXHIBIT S
# REDACTED

# PayJunction Transaction Report

Generated by Johnny Rodriguez at 08/28/2025 02:42 PM PDT

## Transaction Summary

| Capture | | | Void | | | Hold | | | Declined | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| + | 7 | $80.00 | + | 0 | $0.00 | + | 0 | $0.00 | + | 0 | $0.00 |
| - | 0 | $0.00 | - | 0 | $0.00 | - | 0 | $0.00 | - | 0 | $0.00 |
| | 7 | $80.00 | | 0 | $0.00 | | 0 | $0.00 | | 0 | $0.00 |

## Card Brand Totals

| Visa/Mastercard | | | American Express | | | Discover/Diners/JCB | | | ACH/Debit | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| + | 7 | $80.00 | + | 0 | $0.00 | + | 0 | $0.00 | + | 0 | $0.00 |
| - | 0 | $0.00 | - | 0 | $0.00 | - | 0 | $0.00 | - | 0 | $0.00 |
| | 7 | $80.00 | | 0 | $0.00 | | 0 | $0.00 | | 0 | $0.00 |

| Transaction Id | Action | Posture | First Name | Last Name | Type | Acct | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 153967 | Charge | Approved | | | Mc | | 03/04/2024 02:20 PM PST | $50.00 |
| 113324 | Charge | Approved | | | Visa | | 09/07/2022 11:35 AM PDT | $5.00 |
| 80195 | Charge | Approved | | | Visa | | 09/08/2021 10:08 AM PDT | $5.00 |
| 76977 | Charge | Approved | | | Visa | | 08/09/2021 03:08 PM PDT | $5.00 |
| 75141 | Charge | Approved | | | Visa | | 07/22/2021 02:24 PM PDT | $5.00 |
| 60095 | Charge | Approved | | | Visa | | 03/11/2021 09:06 AM PST | $5.00 |
| 28611 | Charge | Approved | | | Visa | | 05/29/2020 10:08 AM PDT | $5.00 |